733 P.2d 743

**In the Interest of Alena Kathyrine DAYLEY, A Minor.**

**John Stanley DAYLEY, Petitioner-Appellant,**

v.

**The STATE of Idaho, DEPARTMENT OF HEALTH AND WELFARE, Defendant-Respondent.**

**No. 16374.**

Supreme Court of Idaho.

Feb. 27, 1987.

Donald J. Chisholm, Esq., and John A. Bradley, Esq., of Chisholm & Bradley, Chtd., Burley, for petitioner-appellant.

Jim Jones, Atty. Gen., and Laura B. Arment, Deputy Atty. Gen., Boise, for defendant-respondent.

DONALDSON, Justice.

This appeal involves the termination of a parent-child relationship. Appellant's main contentions are that: (1) his due process rights were violated because the termination petition failed to specifically state the statutory grounds upon which termination was sought; (2) the decision to terminate his parental rights was not supported by legally sufficient evidence, and (3) the magistrate erred by not addressing the question of appointing counsel and a guardian ad litem on behalf of the child Alena. For the reasons set forth below, we affirm the magistrate's decision.

Alena Dayley was born to the appellant and his common-law wife, Anna Dayley, on July 1, 1983. Thereafter the Dayleys experienced difficulties in their marriage, culminating in Anna Dayley's taking the child and leaving appellant. When appellant located his wife and child, the child had pneumonia, diarrhea and was suffering from various yeast sores. Appellant removed the child from his wife's physical custody and delivered the child to the family of his cousin. Appellant then contacted the Department of Health and Welfare. After a petition was filed under the Child Protective Act, the parents stipulated to the Department of Health and Welfare acquiring custody of the child for three months. The stipulation specified that at the end of the three-month period the child would be returned to her parents and that the parents would comply with certain requirements.

Although appellant maintained regular contact with Alena, and made some payments toward the child's support, he otherwise did not comply with the stipulation. In February or March, 1984, appellant was arrested and subsequently imprisoned for a felony conviction. While incarcerated, appellant did what he could to maintain contact with the child and to provide some minimal financial support. In the meantime, a petition for renewal of custody was filed and after a hearing, the court renewed the custody in the Department of Health and Welfare for a period not to exceed one year.

Thereafter, and prior to the expiration of one year, the Department of Health and Welfare petitioned the court for termination of the parental rights. The mother, Anna Dayley, voluntarily terminated her parental rights, but the appellant, resisted the petition.

The matter was brought before the court pursuant to Title 16, ch. 20 of the Idaho

Code which provides for the termination of parent-child relationships on both voluntary and involuntary basis. I.C. § 16–2005[1] provides for six circumstances under which termination may be granted. The petition filed by the Department of Health and Welfare failed to allege which of those conditions it relied upon in seeking termination. At the hearing, however, counsel for the department argued only that the first of those conditions existed—abandonment of the child by the appellant. The court concluded that the state had failed to show by clear and convincing evidence that the child had been abandoned. However, it did find that, although not specifically argued by the state nor specifically alleged in the petition, evidence was presented concerning the second condition under which termination is permitted—neglect or abuse of a child by the parent. Although the court concluded that there was clear and convincing evidence to establish that the appellant did neglect the child and, therefore, grounds existed for the termination of the parent-child relationship, it nonetheless determined that the finding of neglect, in and of itself, was not sufficient to justify the termination. Noting the legislative intent that termination be granted only where it is impossible to preserve the family, the court found that appellant had continuously been involved in criminal activity; he had failed to maintain steady employment; and he had failed to maintain a stable and

continuous residence; and he abdicated his role as a parent with his child and failed to comply with his agreements with the department which would have returned the child to his custody. Based on that evidence the court found that the probability of the appellant reversing a decade of irresponsible behavior to be extremely remote. Thus, based on the evidence of neglect and the unlikelihood of re-uniting the family, the court concluded that the evidence justified a termination of appellant's parental rights.

The appellant argues that the state's petition seeking termination constitutes an insufficient pleading because the state failed to specify which of the six grounds for termination of parental rights set forth in I.C. § 16–2005 (1979), the state was alleging. For this reason, appellant asserts he was not provided with adequate notice and, therefore, his due process rights were violated.

A pleading which sets forth a claim for relief, however, need only contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends; (2) a short and plain statement of the claims showing the pleader is entitled to relief; and (3) a demand for judgment. I.R.C.P. 8(a)(1). A review of the record shows that the state's petition states in part:

---

1. I.C. § 16–2005 states in pertinent part:

"**16–2005. Conditions under which termination may be granted.**—The court may grant an order terminating the relationship where it finds one or more of the following conditions exist [exists]:

"a. The parent has abandoned the child by having failed to maintain a normal parental relationship, including but not limited to reasonable support or regular personal contact; failure of the parent to maintain this prima facie evidence of abandonment under this section.

"b. The parent has neglected or abused the child. Neglect as used herein shall mean a situation in which the child lacks parental care necessary for his health, morals and well-being.

"c. The presumptive parent is not the natural parent of the child.

"d. The parent is unable to discharge parental responsibilities because of mental illness or mental deficiency, and there are reasonable grounds to believe the condition will continue for a prolonged indeterminate period and will be injurious to the health, morals and well-being of the child.

"e. If termination is found to be in the best interest of the parent and child, where the petition has been filed by a parent or through an authorized agency, or interested party.

"f. Where a consent to termination in the manner and form prescribed by this act has been filed by the parents of the child, no subsequent hearing on the merits of the petition shall be held. Consents required by this act must be witnessed by a district judge or magistrate of a district court of the state, whether within or without the county, and shall be substantially in the following form: . . . ."

"8. The natural father of Alena Kathyrine Dayley, John Stanley Dayley, is currently incarcerated in the Idaho State Penitentiary in Boise, Ada County, Idaho. The records in this case show that the natural father of the child has failed to comply with his agreement with the Department of Health and Welfare for reuniting the family and that he has failed to cooperate with the Department of Health and Welfare in attempts to provide adequate care and a stable home environment for the child.

"9. The above-named child has no assets.

"10. That it is in the best interests of the above-named child to terminate the parental rights of the natural mother and father of Alena Kathyrine Dayley.

"WHEREFORE, your Petitioner prays that the parental rights of Anna Kathyrine Dayley and John Stanley Dayley be terminated as to the above-named child, and that an Order of this court issue terminating said rights and vesting legal custody of the above-named child in the Department of Health and Welfare for placement and adoption."

█ The above language makes reference to appellant's failure to comply with the agreement for reuniting the family, appellant's failure to cooperate in providing care and a stable home environment for the child, and the state's belief that the best interests of the child would be served by terminating the appellant's parental rights. We conclude appellant was provided adequate notice that the state was seeking to terminate his parental rights. It was not necessary that the state allege precisely which of the six subsections of I.C. § 16–2005 under which it was proceeding. A simple and concise statement of facts is all that is necessary. *Collard v. Cooley,* 92 Idaho 789, 793, 451 P.2d 535, 539 (1961).

█ Appellant next raises several arguments concerning the legality and sufficiency of the evidence. First, we note that a parent-child relationship may be terminated by the court when it finds that the parent has neglected or abused the child, or that termination is found to be in the best interests of the parent and child. I.C. § 16–2005. The trial court must base such findings on clear and convincing evidence. I.C. § 16–2009. However, on appeal we will not disturb those findings, if they are supported by substantial and competent evidence. Rhodes v. State Department of Health and Welfare, 107 Idaho 1120, 695 P.2d 1259 (1985).

█ Appellant argues the trial court erred when it based termination in part upon his past character evidence. He contends such evidence is irrelevant since it is only the parent's *present* parental fitness that is in issue. We disagree. A reading of the trial court's opinion demonstrates that the evidence of appellant's past was considered in determining whether he would be a neglectful parent at the *present time* and *in the future.* The use of that evidence is supported by the case of *State ex rel Child v. Clouse,* 93 Idaho 893, 477 P.2d 834 (1970). In *Clouse,* the Court considered evidence showing the father had been unable to hold steady employment which resulted in numerous convictions for public intoxication, as well as burglary. This, when coupled with the mother's actions, sufficed as evidence for termination. Remoteness concerns the weight of evidence, not its admissibility. *Blankenship v. Brookshier,* 91 Idaho 317, 322, 420 P.2d 800, 805 (1966). Additionally, the trial court has broad discretion in determining whether evidence is or is not too remote. *Id.* We conclude the trial court did not abuse its discretion in considering appellant's past along with other relevant evidence, and the record indicates there is substantial and competent evidence supporting the decision to terminate appellant's parental rights.

Appellant argues further that the trial court erred by finding the neglect an insufficient reason to terminate, but terminating his rights any way because the trial court could not foresee the preservation of the family. Appellant asserts that the improbability of reuniting the family is not a ground within I.C. § 16–2005 upon which

termination may occur. We find this argument unpersuasive.

I.C. § 16–2005 states that the court "may" terminate parental rights upon a showing of any of the enumerated conditions. The trial court concluded that there was clear and convincing evidence to establish that appellant did neglect the child and, therefore, grounds existed for termination of his parental rights. At this point the trial court had the power to terminate appellant's parental rights. However, recognizing the severity of such an action and the important societal values at stake, the court searched the evidence to determine if it was possible to reunite the family, despite the fact that there was clear and convincing evidence of neglect. Upon this further inquiry, however, the court determined the evidence justified the termination.

■ It is clear to us that the additional inquiry of the trial court and its conclusion therefrom established that termination of the parent-child relationship would be in the best interests of the parent and child. I.C. § 16–2005(e) permits termination, if it would be in the best interests of the parent and child. Therefore, we conclude that not only is there substantial and competent evidence supporting the finding of neglect, but also the finding that reuniting the family would be extremely remote falls within the condition permitting termination in the best interests of the parent and child.

■ Finally, appellant contends the trial court erred by failing to address the question of whether a guardian ad litem should be appointed to represent the child. We disagree. I.C. § 16–2007 provides, in pertinent part, that "the court *may ... appoint a guardian ad litem as may be deemed necessary or desirable,* for any party." I.C. § 16–2002(m) defines "party" to include the child in a termination proceeding. Therefore, appointment of a guardian ad litem to the child is within the discretion of the trial court. A review of the record indicates that the judge had before him a report from a Department of Health and Welfare social worker. That report states in part:

> "We have made contact with this family and explained the situation with Alena, her legal status and other aspects of the case with them. They are willing to take Alena under the terms that they may be able to adopt her when she becomes available for adoption. L.D.S. Social Services is licensing the home for foster care and will give the Department copies of all licensing materials needed. The home is in Idaho, but not in the Mini-Cassia area.

> "I have included in my contacts, the Dayley's—Alena's present foster parents, Mr. Al Barrus—Deputy Prosecuting Attorney, DeeAnn Cahoon—guardian ad-litem. There is a consensus that this plan for Alena is a reasonable one for her." Clerk's Record, vol. 1, p. 14.

From this report, it is evidence that the guardian ad litem supported the respondent's position. In any event, evidence was before the court that indicated a guardian ad litem had been representing the child and, therefore, the court did not abuse its discretion in not appointing a guardian ad litem for the termination proceeding.

We have considered appellant's remaining assignments of error and find them to be without merit. Having concluded that the trial court committed no error, and the termination is supported by substantial and competent evidence, the judgment below is affirmed.

Costs to respondents.

No attorney fees on appeal.

SHEPARD, C.J., and BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, dissenting.

## I.

Two capable attorneys saw enough quality in a reformed John Stanley Dayley to provide him with representation in what were the most unfavorable of circumstances. Mr. Dayley was serving a prison term imposed upon him for having written a

series of insufficient funds checks in the Burley area, where he lived. Just six months before his scheduled release, the Department of Health and Welfare filed a petition to terminate Mr. Daley's father-daughter relationship with his two-year-old daughter, Alena. Compounding and prejudicing Mr. Dayley's predicament, Alena's mother, just three weeks before the filing of the petition, had voluntarily relinquished her parental rights and left the area. The Department then seized upon this excellent opportunity to gain legal custody of Alena so that it could place her for adoption. Such was the prayer of the Department's petition. Contemporaneously with the April 25, 1985 petition, the Department filed with it the report of Mr. Dale Walquist, an employee of the Department, which included:

(1) A two and one-half page summary of Mr. Dayley's problems with the law going back to 1960, the year when Mr. Dayley was a 17–year-old youth, and culminating in February of 1984 with a $267.50 fine plus court costs for driving with a suspended license and having no proof of insurance, and then two insufficient funds checks, which garnered him the prison sentence.

(2) A summary of some hearsay statements, concerning an earlier marriage (by which he had four children), by various people who did not speak well of Mr. Dayley's 1970's behavior.

(3) Conversations he had had with Mr. Dayley beginning in December of 1983 through the middle of March 1984, when Mr. Dayley was jailed for insufficient funds checks, prior to being moved to the prison, and a hearsay upon hearsay report that Mr. Dayley had been given two weeks' restriction for a prison infraction.

(4) A conclusion that, "[a]t this time, the Department of Health and Welfare feels very strongly that the termination of Stan's parental rights to his daughter Alena would be in her best interest." (Apparently Mr. Walquist had been authorized to so speak for the Department. He was neither a psychologist nor a psychiatrist, *infra*.)

Idaho statutory law, I.C. § 16–2008, allows the Department to file such a report, calling it a "social study" and stating that "the purpose of the investigation is to aid the court in making disposition of the petition and shall be considered by the court prior thereto." Under I.C. § 16–2009, it is clear, however, that a prerequisite to that consideration is that it *must first be admitted into evidence:*

The court's finding with respect to grounds for termination shall be based upon a preponderance of evidence under rules applicable to the trial of civil causes, provided that *relevant and material information of any nature, including that contained in reports, studies or examinations, may be admitted and relied upon* to the extent of its probative value.

I.C. 16–2009.

The Walquist *report* in this case, however, was not admitted into evidence, nor was it offered at the hearing, although it could have been. Nevertheless, it was as much before the trial court as the petition, both being a part of the record. The prejudice it would do to Mr. Dayley was inestimably great.

It was in that situation that attorney Robert M. MacConnell of Boise, Idaho, undertook Mr. Dayley's representation in what would be the most important litigation in Mr. Dayley's life. He was incarcerated fifteen miles out of Boise, and the people who had known him and his relations lived in the Burley area. The Department had well-painted Mr. Dayley as a no-good, do-nothing, ne'er-do-well whose daughter should be taken away from him "right now" and certainly before he was released from imprisonment and had an opportunity to prove that he was indeed a reborn Christian man who would take a respectable and productive place in the community, and establish his ability to preserve his relationship with his little daughter. Impliedly, he had been asked to follow the mother's lead in relinquishment, but

had declined to do so. The Department decided to have the decision made for him by an Idaho court.

When awards are passed out to lawyers for dedication in representing the needy in the face of overwhelming odds, Mr. MacConnell should be first in line as a recipient. Mr. John A. Bradley, of Burley, who in turn has handled the appeals to district court and then to this Court, should receive a second such certificate of award. Also entitled to the greatest respect is Judge Holloway, who listened to Mr. Dayley's testimony, closely listened, and gave him credit for the efforts which Mr. Dayley had made, under adverse circumstances, to drag himself up into respectability and prepare to be a father to his daughter.

## II. THE TRIAL

This was not a prolonged hearing. Apparently, Mr. Dayley was allowed to leave the prison for the one-day hearing. The testimony taken was not extensive; there are only 132 short pages of transcript. The Department attorney's examination of witnesses on direct was to the extent of 94 pages, with cross-examination by Mr. MacConnell using up but 31 pages. Mr. MacConnell's entire direct in the whole proceeding was but eight pages of examination—no cross of his one witness—and the remaining few pages of the transcript was a short colloquy.

This came about because counsel for the Department elected to call Mr. Dayley as the Department's first witness. Department's counsel examined him on direct for 54 pages, on redirect for five pages, and on further direct for three more pages.

### A. *John S. Dayley, the early years.*

The Department's examination, over Mr. MacConnell's objection, took him from his date of birth in 1943, to service in the Navy before his senior year, and graduation from Burley High School in 1963. Following graduation from high school, Mr. Dayley had summer employment with Rupert Auto Service and then enrolled at Rick's College. After completing two semesters at Ricks,

he worked for Kimberly Bean and Seed in Springdale (near Burley) in the summer of 1964. He then worked in construction in Portland, Oregon, for Billings and Crown, a general contractor. In the spring of 1965, Mr. Dayley obtained employment with Sinclair Oil Company in Kansas City, and by that company was transferred to Washington, D.C.—ten months of steady employment.

Keeping in mind that Mr. Dayley was testifying as a Department witness, and especially remembering that it is extremely doubtful that counsel for the Department had ever had the occasion to go over Mr. Dayley's testimony with him, it is important to observe throughout this unusual situation the manner of Mr. Dayley's prompt and concise answers and his open honesty as to things in the distant past of which Department's counsel could not have known. Department counsel wanted to know the circumstances which occasioned his failure to show up for work:

Q. How long were you in Washington, D.C.?

A. About nine months.

Q. Okay. What happened to that employment?

A. I was released from that employment for failure to appear at work.

Q. Why did you fail to appear?

A. I got drunk and fell off from a bus and wound up in a hospital.

Tr., pp. 15–16.

Mr. Dayley returned to Burley after Sinclair Oil terminated him and worked for his father until he was given a three-year prison term for an insufficient funds check over the amount of $10.00. He served nine months before that sentence was overturned and the conviction expunged—all of which information should have been readily available to the Department with its considerable staff and resources. It should all be a matter of record in the Minidoka County Courthouse.

On his release, he obtained employment with Ore-Ida which lasted for six or seven months until a general layoff in 1967,

which left him unemployed just after having married Nancy (not the mother of Alena.) Within two months, however, he obtained short-term employment with Amalgamated Sugar, and thereafter worked a short time with his father, and then went to work for Teton Stud Mills at Dubois, Wyoming until they started laying off just before Christmas of 1968—and then back to Burley where he worked for L.E. Page, a well-drilling concern—a short-term job on two wells.

Following that was a move to Boise and a job with Trus Joist Corporation. While employed at Trus Joist, he completed a semester in engineering at Boise State University and returned to Magic Valley where he was employed by Tell Construction Company at Twin Falls until Mr. Tell's death. Then it was back to Portland for employment by Pierce Manufacturing Company for two years, until November 1971. Gaining employment with Rupert Iron Works, he then worked in Rupert until the accidental death of Mr. Reid Larson, the shop foreman.

## B. *John S. Dayley, the middle years.*

From that job he moved to Twin Falls for employment by Camerons, Inc., working as a welder and mechanic. This employment lasted until September of 1972. When asked what caused the termination of this job, there was no hesitation on the part of Mr. Dayley to answer:

Q. Okay. And why did you leave there?

A. I was arrested.

Q. Okay. And in September or it was it in June?

A. (No response).

Q. Or—

A. It was in late fall or late summer or early fall of '72.

Q. Where were you arrested?

A. Smith Food King.

Q. In Twin or Burley?

A. In Twin Falls.

Q. And what were you arrested for?

A. Armed robbery.

Q. What else?

A. I was shot up a few times.

Q. What else were you arrested for?

A. I wasn't arrested for anything else.

Q. You weren't arrested for resisting arrest?

A. Oh, excuse me. I was charged with resisting arrest, but they didn't bring that charge.

Q. That was later dropped?

A. No.

Q. It was brought up later?

A. Yes. It came up later.

Q. Did it arise out of the same incidence?

A. Yes.

Q. Okay. And were you convicted of those charges?

A. Yes.

Q. Was that a plea or did you go to a jury trial?

A. I went to a jury trial.

Q. Were you sentenced?

A. Yes.

Q. What was your sentence?

A. Ten years on armed robbery and five years on resisting arrest to run concurrently.

Q. Were you sent to the penitentiary?

A. In 1973 of April.

Q. Actually wasn't it you showed up there February 13th, would that be correct?

A. That is probably correct.

Q. You had to serve those two sentences?

A. Yes.

Q. Did you, in fact serve those two sentences?

A. I have been serving them.

Q. And how long were you in prison?

A. Until sometime in '74 at which time I bonded out.

Q. Were you on appeal?

A. Yes.

Q. That is why you were able to bond out?

A. Yes.

Q. When did you go back?

A. Sometime in '75.

Q. Do you recall when?

A. I'm not sure of the exact date.

Q. If the prison records show it's March 9th of '75 would that be correct?

A. That probably would be correct.

Q. At the time you bonded out which apparently would have been—You were out almost a year or just over a year?

A. Eleven months.

Q. What did you do during those 11 months?

A. I worked for Wes's welding for several months.

Q. How many months?

A. Four or five months.

Q. Why did you leave there?

A. They finished their contract in Idaho Falls.

Q. Okay. Then what did you do next?

A. I went to work for McGreggor logging.

Q. Where was that?

A. Bear Valley.

Q. How long were you working for them?

A. Until November.

Q. So how long were you there total?

A. Four or five months.

Q. Okay. And after you left McGreggor, what did you do?

A. I went back to prison.

Tr., pp. 25–28.[1]

For the eleven months that Mr. Dayley was out of prison, he was regularly employed, which may have been a factor in his being released on parole in 1977. He then resumed working for Wes's Welding, which had employed him when he was out on

bond pending decision on appeal. He was not discharged from this job, but:

Q. Why did you leave there?

A. I went back to jail.

Q. Okay.

A. I lost my parole.

Q. That would have been when?

A. Oh, the summer of '77.

Q. What did you go back to jail for?

A. Changing my job without permission and moving without permission.

Q. Did you keep in contact with your parole officer?

A. Yes. I did keep in contact with my parole officer.

Q. But you didn't tell him you were moving or changing—

A. That is correct.

Q. What did they do with you at that time?

A. They violated my parole and sent me back to prison.

Q. Those were the only reasons?

A. That was the only reasons stated at the parole hearing.

Q. Were there any other reason you were aware?

A. That I know of, no.

Q. No other allegation made? Are you sure of that?

A. I was charged with some insufficient funds check charges, but those charges were dismissed. That is what you wanted hear I'm sure.

Q. That was part of the plea bargain; isn't that right?

A. (No response.)

Q. That you would go back to penitentiary and they would drop the charges. Wasn't that part of the negotiation with the prosecutor at that time?

A. No.

---

1. Counsel for the Department purposefully did not inquire why Mr. Dayley had to return to prison. On February 6, 1975, this Court released its opinion in *State v. Dayley*, 96 Idaho 527, 531 P.2d 1172 (1975), affirming the convictions for robbery and resisting arrest. Mr. Dayley did not contest the ten-year sentence. After being arrested and charged, he admitted the facts of the robbery, and defended only on the "claim that during the evening before the incident an acquaintance of his younger brother had adulterated his coffee with 'orange sunshine,' a street name for lysergic acid diethylamide (LSD). Dayley claimed that his actions in the store and parking lot were the product of an altered mental and emotional state caused by the involuntary ingestion of that drug."

Q. What was it? Why did he drop the charges?

A. He stated that I was going back to the penitentiary and there was no point in prosecuting the charges.

Q. So he dropped them when he heard you were going back to the penitentiary?

A. That is correct, but we didn't negotiate a plea or anything of that nature.

Q. Okay. You went back to the penitentiary then when?

A. Oh, it was only about six months later after I was out that I was back in the penitentiary, almost six months to the day?

Tr., pp. 28–30.[2]

Returned to prison, Mr. Dayley (all this time still testifying as a Department witness and answering its counsel's questions) was released from prison June 28, 1979, and immediately was employed in Boise by A–1 Iron Works until they went out of business, and then gained work with Morrison-Knudsen as a designer. This good employment would last only six months:

Q. And why did you quit there or leave there?

A. Because I went to work there telling them that I had no record, and when they discovered I had a record they discharged me.

Q. For falsifying the employment report?

A. No, for not applying [sic, supplying] them the information. I didn't lie on the statement. I didn't have to. There was no question on there.

Q. You just didn't tell them?

A. That is correct.

Tr., pp. 31–32.

Counsel for the Department desired to show the court another insufficient funds check charge about that time, of which it had knowledge and an inkling of which was in the Walquist report:

Q. Let's go back a little bit. In December of '79 you were in Boise?

A. Yes.

Q. Were you arrested during that period of time?

A. Yes.

Q. For what?

A. Insufficient funds checks.

Q. And what happened to that?

A. The charge was dismissed.

Q. Isn't it true the bond was forfeited?

A. Not that I know of, no.

Q. If record shows that $300 bond was forfeited you don't know about that?

A. I forfeited a bond, but I did appear in Court and later the bond was exonerated. I used that bond, in fact, to pay off the check.

Q. Okay. And then in January of 1980 were you also charged with insufficient funds checks?

A. The same incident, yes.

Q. Okay. And were you then—was a warrant put out for failure to appear?

A. Yes.

Q. And why was that?

A. Because I appeared in the wrong court with my attorney.

Q. Okay. You paid off the checks and they dropped the charges?

A. Yes.

Tr., pp. 32–33.

The Department's counsel then began moving Mr. Dayley's testimony toward a drinking problem which began in California. This line of questions and answers shows that Mr. Dayley, after his M–K dismissal, gained short-term employment in California with Trailright Trailers in Costa Mesa, and then six months employment with B.P. John Furniture, a furniture designer, and then a better design engineer position with Stange Hydronics—which lasted about a year and a half.

C. *John S. Dayley, the pre-Alena years.*

Q. Okay. And during this period of time were you arrested for drunk driving?

---

2. The Department's report, not offered or admitted in evidence, but nevertheless in the record, sustains Mr. Dayley's recollection, as does this Court's opinion in 1975.

**532**

A. Yes.

Q. July of 1980?

A. Yes.

Q. Also in December of 1980?

A. Yes.

Q. Also in January of 1981?

A. No.

Q. You weren't at that time?

A. No.

Q. About May of 1981?

A. Yes.

Q. Is it fair to say you had a drinking problem at that time?

A. Yes.

Q. How serious was it?

A. It was serious.

Q. Okay.

A. Serious enough I sought help at the Salvation Army.

Q. Okay. How long were you with Stange?

A. About a year and a half.

Q. Why did you leave there?

A. Because I was arrested and went to jail.

Q. For what?

A. Failure to appear on a D U I.

Q. And how long were you in jail?

A. Thirty days or so.

Q. Was that the one in May of '82?

A. Yes.

Q. So that would have been your fourth charge?

A. That was the same charge. I had failed to appear and was re-arrested on that same charge.

Q. Did you get another D U I in May of '82?

A. Not until after I got out of jail.

Q. Okay. And when you got out of jail did you get another one?

A. Yes.

Q. And that was June of '82?

A. Yes.

Q. (NOT AUDIBLE). What happened then?

A. They brought all of the D U I charges together. I made several fine payments and was placed on probation.

Q. Isn't it true that the record—if the record from Orange County Sheriff's office confirms that you still have some outstanding warrants in that county, would that be correct?

A. No. That is not correct.

Q. Why isn't it correct?

A. Because that is not correct.

Q. July of 1982 were charged with issuing checks without sufficient funds?

A. No, I was not.

Q. Do you have any idea why that is on your record?

A. No. I do not.

Q. You are saying the record is false?

A. No. I'm saying I was not charged.

Q. Okay. In August of 1982 were you charged with another D U I?

A. No.

Q. In August of '82 were you arrested?

A. No, I wasn't in California in August '82.

Q. There wasn't a $2,500 bond put up?

A. No.

Q. Okay. Why did you say you left Stange again? I'm sorry.

A. I was arrested and held in jail for 30 days for failure to appear.

Q. Okay. After Stange did you find another job after that?

A. No.

Q. What did you do after you left?

A. I left California.

Tr., pp. 35–38.

After leaving California, Mr. Dayley obtained a house remodeling job which lasted August through October of 1982 and then subsisted in Burley on California unemployment compensation—about two months—and went to Portland with Alena's mother, whom he had met in Burley. The purpose of the move was civil litigation wherein Alena's mother (Anna) was trying to enforce in Oregon an Idaho court order which gave her custody of children by a prior marriage—Oregon declining to recog-

nize Idaho's jurisdiction. While there in this endeavor, about a year, Mr. Dayley had only three or four months employment as a mechanic for Mark Toncan Ford, Portland, Oregon.[3]

Alena had been born July 1, 1983, while they were in Portland.

D. *John S. Dayley, the Alena years begin.*

Mr. Dayley explained to the Department's counsel how it was that he lost this Portland job:

A. I was fired.

Q. Why?

A. Failure to be on the job.

Q. Did you still have a drinking problem at that time?

A. No.

Q. Why were you—

A. In fact I wasn't drinking or doing anything like that at all.

Q. Okay. Why weren't you on the job?

A. *I was looking for my daughter and my wife.*

Q. Okay. When was Alena born?

A. July 1st, 1983.

Q. While you were in Portland?

A. Yes.

Q. When did you leave Mark Toncan Ford?

A. Sometime in August.

Q. Did you wife leave you at that time?

A. No. *She hadn't left me. She just disappeared.*

Q. All right. What did you do after you left Mark Toncan Ford?

A. I went to work for Faught and Company, but that was a couple months later.

Q. Faught?

A. (F-a-u-g-h-t).

Q. And it's a company?

A. Yes.

Q. What did you do for them?

A. I worked as a welder/mechanic.

Q. How long were you there?

A. Two months.

Q. And why did you leave that employment?

A. I was laid off for cause.

Q. What cause?

A. Failure to appear at work.

Q. After you left Faught, where did you go next?

A. Back to Burley, Idaho.

Q. And you brought your family with you?

A. Yes.

Q. And why did you leave Oregon?

A. The unemployment rate there in Oregon was about 12% unemployment. Jobs were very difficult to find. I had family here in Burley, and I had a problem with my wife.

Q. What was that problem?

A. Well, she was running around and getting involved with people I didn't feel she should be getting involved with and doing things with our daughter I didn't feel she should be doing.

Q. Was Alena neglected or abused during this period of time?

A. Not by me.

Q. Was she by anyone?

A. Yes by Anna.

Q. By Anna?

A. Yes, by Anna.

Q. When did you return to Burley?

A. Early September.

Tr., pp. 41–43.

Counsel for the Department then developed through Mr. Dayley two unhappy work relationships in Burley, and then being jailed for insufficient funds checks, his robbery parole being revoked, and a new sentence for the check writing. Mr. Dayley even knew more about one other check charge than his interrogator:

Q. ... Are you now charged with any other charge?

---

**3.** As mentioned *supra* and *infra*, Mr. Dayley's answers to all questions were articulate, concise, and in detail.

A. Yes. Mr. Al Barrus of Burley, Idaho, brought up another one of those same checks from 1984 and charged me with another one.

Q. And Mr. Al Barrus is the one you wrote the check to?

A. No.

Q. How did he bring it up?

A. He is prosecutor, and he had possession of that check in 1984.

Q. Is he the prosecutor at the present time?

A. I don't know.

Q. You're not sure if I brought that up or not, are you?

A. It states on the paper that you did.

Q. It states I was the one that brought it up?

A. Yes.

Q. How does it state that?

A. It has your name on bottom and top of the paper.

Tr., p. 48.

But, the interrogation continued on and retrogressed to the earlier marriage to Nancy, and four children born of that marriage, notwithstanding that an answer to one of the Department counsel's questions established that the marriage to Nancy had ended *twelve years* earlier. Again, Mr. Dayley quietly but effectively showed a superior awareness of the Nancy affair:

Q. What else have you paid?

A. Approximately $300 in clothes, and—

Q. Okay.

A. And approximately $500 in medical bills.

Q. Excuse me. When was your payment in medical bills?

A. I beg your pardon.

Q. When did you make the medical bill payment?

A. Let's see, it was when I was out on parole in 1979.

Q. How did that come about?

A. I was sued.

Q. Because of the lawsuit you paid some medical bills?

A. Because I was unaware of the fact it hadn't been paid, yes, I was sued and I paid it.

Q. And those went back to the time you were living together?

A. Yes.

Q. And any other payments?

A. No.

Q. When was the last time you made a payment on child support. Would that have been the payment on medical bills?

A. Yes.

Q. And since then you have made no payments?

A. No.

Q. When you were working for Stange Hydronics, what kind of money were you making?

A. About 3,400 a month.

Q. Thirty-four hundred dollars a month?

A. Yes.

Q. Okay.

A. That is gross.

Q. What was net?

A. About 2,500.

Q. You had that job for a year and a half?

A. Yes.

Q. During that year and half, you didn't pay any child support?

A. Nope.

Q. Okay.

A. I think you're going on the assumption that child support was still ordered by Court. However, when we were divorced—or excuse me. When I was returned to prison in 1967, I signed adoption papers and the Court terminated the child support.

Q. That adoption never went through was it?

A. As far as I know my parental rights were terminated in 1967.

Q. Didn't you, in fact, go to Court and fight the termination of your rights?

A. No.

Q. If the records show different, they are wrong?

A. The records won't show different.

Q. Okay. Do you have a copy of the paper you signed terminating your rights?

A. Yes.

Q. Do you have that with you?

A. No, I don't.

Q. Can you produce that?

A. I think I can, but it may take some time and effort, because I'm incarcerated.

Q. If your ex-wife denies it ever happened, you are saying she is just wrong?

A. Yes. I will state that she is wrong.

Tr., pp. 51–53.

E. *History germane to the issue.*

Q. Okay. Now, are you currently able to take care of your two year old daughter?

A. At this present time?

Q. Yes.

A. Financially, no.

Q. Physically?

A. I'm incarcerated.

Q. How long do you plan on being incarcerated?

A. Six months.

Q. What is your release date?

A. Either December 22 or January 13. December 22 of this year or January 13th of next year.

Q. And has the date been set by the parole board?

A. Yes.

Q. Why is it an either/or date?

A. Because it depends on the outcome of a hearing in Court which hadn't been held yet.

Q. What is that hearing?

A. I had 30 days good time taken from me by the parole board.

Q. What was that for?

A. I went to detention in March of this year while I was incarcerated.

Q. Why?

A. For paying protection money.

Q. That is what the allegation is?

A. Yes.

Q. Have you had any other write-ups since you have been in the penitentiary this time?

A. No.

Q. That is it?

A. That is it.

Q. Where are you now residing? What part of the penitentiary?

A. North Idaho Correctional Institution Cottonwood. *Minimum custody facility.*

Q. Are you in their program or just being housed there?

A. I'm just being housed there along with about 60 other timers.

Q. *That is because of an overflow problem?*

A. *No, it's a privilege.*

Q. It's a privilege?

A. Yes.

Q. Is there a crowding problem?

A. There definitely is, but they don't move people because of that.

Tr., pp. 53–55 (emphasis added).

F. *Anna absconds with Alena and is found.*

Q. Okay. What happened when you came back to Burley in the fall of '83? What happened to Alena?

A. Anna took off with her and was gone for quite a few days. It took me about five days to locate her.

Q. Where was she located?

A. She was in a Mexican's home. I don't know the exact address, but right over here in east Burley.

Q. Okay.

A. There was no heat in the house.

Q. What month was it?

A. December.

Q. What was the weather like?

A. It was freezing cold outside.

Q. And where did Anna take off from. Had you been living together?

A. Yes.

Q. Why did she leave?

A. Why did she leave?

Q. Yes.

A. Because I caught her in a bar downtown with her pants tore out and back side showing, and it made me mad, and I slapped her and told her to get out of the bar.

Q. Okay. In fact, did you rough her up pretty good?

A. No, I didn't.

Q. Did you slap her?

A. Just slapped her.

Q. Okay what happened next?

A. She left the bar and got in her sister's car and went back to the house and picked up our daughter and disappeared.

Q. And then you found her at a Mexican's house in December of '83.

A. Yes.

Q. What did you do then?

A. I didn't find Anna there; *I found Alena there alone.*

Q. Okay. What did you do with her then?

A. I picked her up and took her immediately to Doctor Peterson's office.

Tr., pp. 55–56 (emphasis added).

The Department's counsel asked Mr. Dayley to draw a comparison as to what he could accomplish in a 60–day probation period as against the 60–day period when he found Alena and prevailed upon his cousin and wife to take Alena in and care for her:

Q. What would be different about those 60 days Mr. Dayley than the 60 days between November of '83 when you turned Anna over to the Dayleys in fact over to Health and Welfare and during that 60 day period in there. Weren't you telling or at least Health and Welfare at that time you were going to get your act together and be able to raise this baby?

A. I started to.

Q. Isn't that what you told the department of the Health and Welfare and the Dayleys that you were going to do?

A. Yes.

Q. What would be different about this 60 day period and that old 60 day period?

A. I have time to prepare for that new 60 day period. I didn't have time to prepare.

Q. What difference is time going to make, Mr. Dayley?

A. It makes a lot of difference. Would you like me to be specific about how much difference it makes?

Q. No....

Tr., pp. 59–60.

Perhaps counsel, having called the witness, is within his legal rights to ask a question and then cut off the answer. That is irrelevant here, because the trial court astutely knew that Mr. MacConnell would attend to taking care of what was at least a discourtesy, and he did so:

Q. Was it your understanding the adoption you had been told was going to take place and actually had taken place and the children were no longer yours?

A. Yes. That is what I have been told for years.

Q. Who has been telling you that?

A. Sue for one, my brothers for another, and my attorney for another.

Q. Who was your attorney?

A. Doug Whipple.

Q. When was the last time you were told that?

A. Well, by Sue the last time I was told that was about 1979, and by my brothers the last time I was told that was 1980 and '81.

Q. Were you ever given any information to you that that was not the case?

A. No.

Tr., pp. 62–63.

And, in addition to explaining the wholly unimportant prison restriction—which might be mentioned later, time permitting, but I will say now culminated favorably to Mr. Dayley—Mr. MacConnell brought out some additional facts on rescuing Alena, and explained how it was Mr. Dayley who, on advice of a spiritual advisor, brought the Department into the picture, and also his own important admission that where liquor is concerned he could be classified as

an alcoholic who absolutely must be abstentious:

Q. The incident in the fall of 1983 when Anna took Alena and the days period and until you later found Alena in December, what was your feeling at the time that your daughter disappeared?

A. I wanted to protect her. I wanted to find her. I was desperate. In fact, I spent most of my time looking for her.

Q. Is that why you lost your job?

A. Yes.

Q. And how did you go about looking for her?

A. Walking because I didn't have transportation at the time. The rear end of my car was out.

Q. How long did it take you to find her?

A. Five days.

Q. And what did you do when you found her?

A. I immediately took possession of her and took her to the doctor and had her treated. Because I didn't have the means to take care of her and work, I took her out to my cousins' and asked for their help, and I explained the circumstances to them. And the possibility that Anna could legally come out and demand she give Alena up to them. *I was told by a bishop of the Mormon Church that I should contact the department of Health and Welfare, and I did so.*

Q. Who was that bishop?

A. Boyd Poulton.

Q. Now, you got into a little bit of a discussion with Mr. Barrus regarding your opinion as to whether or not you were going to have time to prepare and whether or not the time you had would make a difference at this time. Would you explain what your side of that position is?

A. Well, in December of 1983 all this was thrust upon me suddenly. I came down here with no money, no job, and an infant daughter to support, a wife who didn't want to help support or care for my daughter, and I worked diligently to try to obtain jobs and so forth, but it was

trying to hold a job and obtain more jobs at the same time. In other words, get a business of my own going on a no notice basis, no preparation basis. And in this instance, I have six months in which to prepare. Not only that, I'm apprised of agencies, state and governmental agencies who are willing to work with me to assist me emotionally so I won't start drinking again, and I did start drinking again in January of 1983.

Q. Are you an alcoholic?

A. Yes, I am.

Q. And do you have any problem being that?

A. I have had, but I don't now.

Q. Do you think that your alcoholism is under control at this time?

A. Well, the only way you can control alcoholism is stay away from alcohol. I believe I can do that, but I know I am going to have to maintain the associations that I have over the past year and a half. I have been president of the Alcoholic Anonymous Association and chairman of the present east Boise group and Pleasant Valley group of Alcoholics Anonymous since I have been incarcerated.

Q. In the prison area there is a concoction they call "squawky" is it not?

A. Oh, yes, but that is not the only thing available.

Q. What is available?

A. Whiskey, Vodka, anything you want.

Q. Have you ever succumbed to the temptation to use those?

A. No.

Q. Have you kept yourself clean while you were in prison?

A. And I have had ample opportunity to do otherwise.

Tr., pp. 65–68.

Mr. MacConnell brought out Mr. Dayley's work record, in and out of prison, and his work qualifications and future prospects:

Q. Do you have skills you think you can use in the civilian community to support yourself.

A. Yes. I'm a skilled carpenter.

Q. Are you working at that profession right now?

A. Yes, I am. I work for a man named Mike Westhoff for the construction crew there in Cottonwood. I recently built a new set of cabinets and countertops for the Cottonwood Administration Facility, and I have good recommendations from them.

Q. Has Mr. Westhoff agreed that he would speak to the Court or the prosecutor if he was called upon?

A. Yes. They have a policy there at the prison, no officer is allowed to write a written recommendation. However he stated to me if this Court wanted to call and talk to the man he would be willing to give me a recommendation over the phone. Sgt. Bishop who is in charge of security there in many instances there at the institution also stated he would be willing to give me a good recommendation.

Q. Do you have any qualms about Mr. Barrus or the Department of Health and Welfare people contacting either one of these individuals to speak to them?

A. None whatsoever. Mr. Godsil who is my work supervisor there at the main institution for nine months or so—

Q. How do you spell his name?

A. (G-o-d-s-i-l). Robert Godsil would give me a good recommendation. These recommendations have to be verbal. However, I have a written recommendation from Mr. Bob Godsil in my files here.

Q. Okay.

A. It's not pertaining to this issue, but pertaining to my eligibility for minimum custody. The man felt I was a good work responsibility, and he thought I should be given an opportunity to prove it.

Q. Do you have those in your records here?

A. Yes. May I have—

. . . .

Q. Mr. Dayley, do you feel that if you are released or when you are released rather, whenever that is in January or December, that you can find work?

A. Yes. I'm sure I can.

Q. Have you ever had trouble before finding work?

A. No.

Q. Have you had trouble keeping it, have you not?

A. Yes. I never failed to stay in work. I always—In fact, there are only two periods of my life that I drew unemployment briefly for about four months during my entire life I have drawn unemployment.

Q. Do you think that you can keep a job now that you have got your life in order?

A. Yes. And I have more reason than ever to keep a job.

Q. Do you think you have your life in order?

A. I do.

Tr., pp. 68–70.

Mr. MacConnell wanted the Court to hear directly from Mr. Dayley:

Q. You realize as we have discussed you are going to have to convince the judge that your rights as a parent should not be terminated today do you understand that?

A. Yes.

Q. Is there anything you would like to say to the judge with regard to that?

A. Several things. I have lost the opportunity to participate in the rearing of my other four children by my actions, and for me to interfere with their lives at this point wouldn't be fair to them. Alena is an infant. She is a little baby. And she is going to need care and support for years. I'm going to have the opportunity or I want to have the opportunity to participate and watch her grow, and I want to be the one to be there when she needs me. I want to be the one to supply her with the things she needs. I feel that—I don't feel I know— that I have the ability to earn a good income. I know that as long as I stay away from the alcohol, and I believe I

can stay away from the alcohol, that I can hold a job. Alcohol has been a big problem in my life and I don't deny it. In fact I admitted that over a year and a half ago. And I have done something about it. I have made some aggressive steps toward avoiding alcohol in the future, and I believe I know how to stay away from it, and I believe with some of the support groups and agencies that I can. I love my daughter. *In the last year, I signed a case contract with the Department of Health and Welfare prior to my coming to prison. And they knew I was coming to prison.* On May 3rd, 1984, the Cassia County Magistrate ordered Alena Dayley should remain in the custody of the Department of Health and Welfare for a period of an indeterminate period not to exceed one year—

Q. Mr. Dayley, the Court has that document?

A. All right. I was going to make reference to this though. I have done my best to fulfill all of the clauses in this contract. I have sent every penny I could make and every cent I could make while I was in the institution to my daughter. I have called as often as I possibly could. I have written letters once, twice or three or four times a month. I have called the Department of Health and Welfare, two or three times a month, once a month, whenever it was possible.

. . . .

I tried to go even beyond that because I wanted to do everything I could for my daughter. I wanted the opportunity. I bought insurance on her, and I attempted to buy health insurance but because I'm incarcerated and because of some state licensing conditions or some reason, the agency or company I attempted to and in fact paid to obtain a health insurance policy for my daughter rejected the health insurance policy because I was unable to send them a personal check each month. They wouldn't allow me to pay for it four months in advance or to have a check sent from an attorney. They needed the check sent personally from me. I went through three or four meetings with insurance agents and several other agents and months of work trying to get these agents or to get these insurance policies.

Q. Mr. Dayley, would you be willing to submit to certain conditions under which you would have to live and behave in order to prove your ability to take care of your child once you're released from the institution?

A. I would.

Q. And do you have any objections to those conditions being imposed realizing that the prosecutor is probably going to be participating in the writing up of those conditions?

A. No. I have no objections.

Q. In other words, you understand those conditions would probably be extremely stringent?

A. I would expect them to be so.

Q. Do you think you could live up to them stringent?

A. I would expect them to be so.

Q. Do you think you could live up to them?

A. I believe I can.

Q. Mr. Dayley, is there anything else you would like to say to the Court at this time?

A. There is a great deal, but I'm not sure how much of the Court's time I should take. I want to say this: I love my daughter very much and have done everything within my power to protect her and try to do the best I could for her. I know that I have made some mistakes in the past and I'm asking the Court to believe that I have made some definite changes in my own life and my attitude, and I believe I can cope with my life and raise my daughter. I have made every possible effort to make those changes, realizing when I got out I was going to have to be a different person. I hope the Court will consider that even though I have written insufficient funds checks in the past and might even be five or six charges, not all of those charges are

correct. There are errors there. I'm not going to try to be specific about the errors because I'm not proud of my past, and I don't like to go over it in detail as Mr. Barrus required me to do. I'm ashamed, ashamed of it. I want to try to do something to change it. Mr. Barrus brought up the fact that I'm charged with a new check charge. It's not a new check charge. That check was available to the prosecutor's office when I was charged with the other checks. I don't know why that check charge was brought up today a year later other than possibly try to make it look even worse on me. *I have made a very strong and determined effort over the past year and a half to turn my life around, and I would like the opportunity to do that with my daughter outside of incarceration. I can't do much really to show my intentions or my efforts while I'm in prison, but I have made every possible effort and some of it is way beyond what would normally be expected of a person who has been incarcerated.* I think Mr. Walquist would be able to testify to that.

Tr., pp. 70–75 (emphasis added).

On redirect examination of Mr. Dayley, the Department's counsel asked Mr. Dayley to tell the court how and why things would be better when Mr. Dayley completed his confinement and was released:

Q. And you had the same things to live for then as you have now; isn't that right? Is there anything different between your life in November except for this time you have been talking about? You had Alena and you had your experience that you have for this period in your life. What is the difference?

A. Well, there are about five things that are different.

Q. What is the difference, Mr. Dayley?

A. First, Anna is removed from the picture entirely. I do not have to cope with her. In other words, I don't have to worry about her coming and stealing Alena.

Q. She did not have custody November of '83 until February of '84, did she?

A. Yes, she did.

Q. I thought that custody was in the Department of Health and Welfare?

A. Not until December.

Q. I'm talking about until February. Most of that period of time when you got in trouble she didn't have custody, did she?

A. No.

Q. Okay. What else is different besides her being out of the picture?

A. Okay. My financial difficulties at that time are not as profound or acute because I have managed to pay off a lot of the bills I owed, and I have better job opportunities now. Secondly, I don't have the emotional involvement with Anna that I had then. Third, I don't have the urgency. There is no urgency here. I have had a chance to consider possibility a year or two to look at the options a year or two, to inquire of jobs and companies, persons, regarding what I can do and what I can't do and what they would do and what they wouldn't do. I'm much more aware of agencies now that are there to assist people who need that type of assistance. I didn't have any of this knowledge then. I do now.

Q. Okay. Anything else?

A. Well, I could give you several other examples.

Q. Okay. What are some of the opportunities given to you during that period of time. Weren't you asked or requested to go to the crossroads program in January of '84 and refused?

A. No, I did not refuse.

Q. If Mr. Walquist or someone else from Health and Welfare said you were, would they be telling a fib?

A. If they said I refused, they would be.

Q. What happened.

A. I had to work.

Q. Okay.

Tr., pp. 78–80.

When Mr. Dayley stated that he would like to further clarify his testimony, the Department's counsel cut him off, but Mr. MacConnel's first question allowed him to explain:

Q. [MR. MacCONNELL]: Mr. Dayley, please go ahead with the explanation?

A. At that time I never had been involved with A A in my life. I didn't know what A A was except I thought it was for winos that lived under the bridge. In fact, I was shamed to have any association with A A. I was shamed to have any alcohol problem and wouldn't admit it. Since that time I have had some pretty close association with A A, and I have learned a great deal about them and why they exist and the type of people that go there, ordinary people like you and me or Mr. Hunt there. There is no—Yes, those people make mistakes. And, yes, they are alcoholics, and I don't deny it. Yes, I'm an alcoholic. It's nothing to be ashamed of I have been told and I believe it, so it's nothing to have to hide. It's something to work against. Something to work to avoid. I have never participated any type of drug or alcohol education program prior to this year, but since then I have attended drug and alcohol education program in Idaho State Correctional institution and completed it plus I have attended drug and alcohol education program instituted by the Salvation Army and completed that since my incarceration, so I have a better understanding of why I failed in January of '84, and why the emotional impact. See, my sister died prior to that, not long before that. I was having problems with my wife and having financial problems and all these problems don't exist now. There is one problem that does exist now one I'm incarcerated and two all I'm going to have to do when I got out there I won't be on probation. I won't be on parole. I won't have responsibility to anyone but Alena.

Q. Mr. Dayley, Mr. Barrus adduced from you the testimony that you contributed a total of $50 for Alena. In terms of the—First of all, do you have a lot of money?

A. No.

Q. Where do you get your money?

A. Well, when you work at prison they sometimes pay you. And they sometimes pay you five or ten dollars a month.

Q. And the five dollars you were trying to send Alena, that represented a fairly substantial portion of what money you had at that time, did it not?

A. About 90 to 100 percent.

Q. Would it be inaccurate to say you sent all of the money you could afford or had?

A. I sent every penny I had.

Q. I have no further questions.

MR. BARRUS: Nothing further, Your Honor.

THE COURT: Very well, you may step down.

Tr., pp. 81–82.

### III. HEALTH & WELFARE'S OTHER WITNESSES

Another Department witness called by its attorney was Mr. Walquist, who identified himself only as an employee of 15 years duration. He confirmed and substantiated Mr. Dayley's testimony that it was Mr. Dayley indeed who called on him regarding Mrs. Dayley's concerns about Alena's health and welfare, as a result of which the custody agreement was signed. He testified as to his earlier involvement:

A. Yes. That her and Stan, her husband, had some concerns about the health of the child so she agreed to take the child to the Burley Health Clinic for a checkup. She complied and did this. And the person that examined the baby prescribed some medication and asked that Anna return within one week for another checkup. Within that week *Mr. Dayley found the baby in her sister's, in Anna's sister's home in very poor condition and picked the baby up and placed the baby with Mrs. Evelyn Dayley.*

Q. Okay. Did you see the baby in poor condition?

A. After the child was placed with Mrs. Dayley or Evelyn Dayley, yes, I saw the child.

Q. Did you also recognize it was in poor condition?

A. Yes, it was. Alena had severe respiratory problems, and she had a lot of sores all over her body.

Q. Okay. Did you work with Mr. Dayley from November 23rd to sometime after that in an attempt to try to reunite the child with Mr. Dayley?

A. Yes, I did.

Q. And would you tell this Court exactly what steps you took and what happened when this first started and whenever the procedure stopped?

A. First of all, I sat down with Mr. Dayley and also Anna Dayley.

Q. They were still together at that time?

A. Well, part of the time.

Q. Okay.

A. And by January the, I think, 13th, 1984, we had come to an agreement of what should be done, and the agreement stipulated in the agreement there was a stipulation that the health or Department of Health and Welfare should have custody for a period of three months to give Mr. Dayley a chance to get his life straightened out. He assured me he could do this. At the time we had the agreement, Mr. and Mrs. Dayley had separated, and so I was dealing with two separate parties.

Q. You worked with both of them?

A. Attempted to, but then Mrs. Dayley left the area then and went to Portland. She left the area, and we didn't know where for sometime, and then we later found she had gone back to Portland, so mainly I had contact with Mr. Dayley.

Q. Did he indicate he wanted to straighten his life out?

A. Yes, he did. I had several long conversations with Stan.

Q. Did he think he was in a position to turn things around at that time?

A. Yes, very much so.

Q. You have been here today during this hearing and you heard him testifying; is that right?

A. Yes.

Q. And you heard Mr. Dayley's testimony about the fact he now has changed and things would be different than they were before?

A. Yes, I did.

Q. Have you ever heard that before?

A. Yes, I have.

Q. And when he was telling you this in November, December of January 1983 an '84 *was it any different than it was today?*

A. The only *exception would be that his wife is not in the picture,* but some of the same statements were made.

Tr., pp. 88–90 (emphasis added).

Mr. Walquist also recited some of the things Mr. Dayley had promised to do, per the unadmitted agreement, some of which he could not, some of which he had, and some of which he did not know.

Generally, Mr. Walquist would not be considered very hostile to Mr. Dayley's circumstances:

Q. Okay. Tell us your contact you had with Mr. Dayley during that period of time, and what he was telling you, and what you found out?

A. First of all, Mr. Dayley told me that he was very committed to getting his life in order. That he loved his daughter; that he wanted to provide for her and bring her up like any other normal child. He wanted to maintain employment, and he wanted to erase some of his deficits and the stories surrounding him and he wanted to be respected in the community and be accepted like any other person in the community.

Q. Pretty much the same thing we have heard today?

A. Yes.

Q. What else went on during that period of time?

A. At first I felt like *Mr. Dayley was making some real strides* in preparing to get his daughter back during visitation he had with his daughter, and he *seemed to follow instruction implicitly from what the foster mother set down* as far as care of the child because her respiratory ailment prevented her from being around where people smoked or involved where there was any smoke because it choked her up. She had severe diarrhea and her diet had to be strictly maintained, and I found out during those times on visits that he seemed to do that. He followed the instructions.

Q. He was trying hard?

A. It seemed for approximately a month things were going very well.

Tr., pp. 94–95.

The Department's counsel then elicited some testimony about rumors of new insufficient funds checks and drinking, and on proper objection, sustained such line of testimony as the hearsay which it was.

The Department's counsel attempted next to obtain from Mr. Walquist an opinion, a leading question as well, that it would be detrimental to delay severing the relationship, *i.e.*, do it now while Mr. Dayley still has six months to go before he can again even see his daughter on any basis. A proper objection was made as to Mr. Walquist's qualification, and sustained.

Mr. Walquist was very supportive of Mr. Dayley on cross-examination by Mr. MacConnell:

Q. Mr. Walquist, who brought the Alena case to your attention in the first place?

A. Mr. Dayley.

Q. Did he ever give you any reason to doubt his statements with regard to his love for his child?

A. No.

Q. And during that time you indicated that you had turned up information indicating that Mr. Dayley was back to drinking alcohol; is that correct?

A. Yes.

Q. And were you aware of time when Dayley was not an alcoholic?

A. Only through reports. I only met Mr. Dayley at the time that he called me.

Q. Did Mr. Dayley ever tell you or admit to you at that time that he was an alcoholic?

A. He said that he did not have a substance abuse problem and he did not want an evaluation.

Q. When Mr. Dayley gave Alena to his cousin, Jay, and his wife, Evelyn, that was voluntary, was it not?

A. Yes, it was.

Q. And did Mr. Dayley ever resist your request in any way in having to do with the welfare of Alena?

A. Not the initial placement, no.

Q. I have no further questions, Your Honor.

MR. BARRUS: Nothing further.

Tr., pp. 100–01.

The Department's counsel called a Mr. Hunt for the sole purpose of testifying about a business transaction between Hunt as one party and John Dayley and his brother Frank as the other party. The deal went sour when a $150 check didn't clear the bank. The year was 1978. Five years later John Dayley voluntarily came into Hunt's business place, "said he was back out of jail now and he had got married, and had a child, and he was going to pay me back for, you know, the bad check." A deal was worked out between the two Dayleys and Hunt whereby John Dayley with his skills in welding and carpentry would work out the old debt, and Hunt would advance the money for the materials, which, on direct, he said was $350, but shortly after on cross-examination changed to "around $300.00 and 345 or 355. Let's say no less than $300.... I could be wrong." Hunt did get some of the parts for the trailer.

In short, it was an entirely collateral insignificant dispute which should never have consumed any of the court's time in a very important proceeding.

Apparently it was cover by which Mr. Hunt would be asked if he might have served any beer to Mr. Dayley while Mr.

Dayley was in Mr. Hunt's beer and pizza parlor. Mr. Hunt answered that at first Mr. Dayley told him he had stopped drinking beer, and he, Hunt, said Mr. Dayley had stopped, but in January had "started again." At which point counsel for the Department was pleased to drop the questioning. To Mr. MacConnell fell the burden of bringing out "the whole story" about the beer consumption, that what Mr. Dayley had consumed *was not a lot, not uncommon, that he was in control of himself when he left.* It was not a big deal, and better that the Department had left Mr. Hunt alone to tend his business.

Evelyn Dayley, the wife of John's cousin and mother of seven children, testified to Alena being brought to her, wholly confirming the testimony of John Dayley and Mr. Walquist:

A. November 29th of 1983, about 3:30 or 4:00 in the afternoon, Stan knocked on the door and my nine year old son at the time answered the door and invited Stan in, and then came to get me. As I came into the room Stan said, "Evelyn, I have a big favor to ask of you and Jay. Maybe I had better ask it of you because it would involve you the most." And I didn't answer, and he said, I have my small baby out in the car, and she is really sick and I don't have anyone else to turn for help because my sister died in the spring and the baby is in need of help.

Q. And he brought the baby to you?

A. I asked where the baby was, and he again said she was out in the car, and I told him to bring the baby in the house because it was extremely cold outside.

Q. And that is what happened?

A. Yes.

Tr., pp. 111–12.

Alena, then, was with the Jay Dayley family for all of December 1983, January, February, March, April, and nearly all of May, 1984—just a few days shy of six months. At that time, she was taken away from the family and placed by the Department with strangers in a foster home. That Evelyn Dayley and the family had not taken good care of Alena is not suggested in the record. Evelyn Dayley had taken Alena to Dr. Peterson, the same doctor John Dayley had taken her to, and in turn also to Dr. Pates at Rupert, and to Dr. Adrian, a pediatrician in Twin Falls. Nothing in the record explains the conduct of the Department in taking Alena out of six months of a stable environment.

One minute of further examination by Mr. MacConnell brought out that John Dayley visited on several occasions, and Evelyn was able to pinpoint the first visit on December 5, 1983 (which would be within the first week), and the last time just before he was transported to Boise. Questioned whether she had any doubt that Mr. Dayley loved the baby, she answered "no." There was no further redirect by the Department's counsel.

The Department then called to the stand a Mr. Robert L. Snow, who identified himself as a Health and Welfare employee. At the time, he was a "clinician consultant in the Jerome office." He stated his credentials:

A. I have a bachelor's in social work from Brigham Young University in 1968. And I have a masters in psychiatric social work at the University of Utah in 1972. I have worked from '72 to '74 as a family therapist in Shasta County, California, working with parents who have abused children. Then I have worked in Idaho from 1974 to the summer of 1984 as a psychiatric social worker in community mental health center as a primary therapist. And then since that time I have worked in my present capacity as a clinician consultant in the child protective program in the Jerome office.

Tr., pp. 118–19.

He stated that he worked primarily with children and that his work was in California until 1974, and then in Idaho. He testified to *no prior relationship with Mr. Dayley,* but that he had the file. The file, of course, contained the *unadmitted* Walquist report, which included the subject matter alluded to early on in this opinion—court criminal records going back to John

Dayley at age 17, and a highly prejudicial hearsay account of what a Portland bishop had told Mr. Walquist, presumably over the telephone, and an even worse item of hearsay which was Mr. Walquist's recounting of what wife Nancy had told him about John Dayley's alleged abuse of a child Stanley, whose age was not given other than that he was little Stanley. Not much better, that unadmitted report also included what Mr. Walquist had gleaned from a conversation with Nancy's mother. All in all, the Walquist report was six typewritten pages of *unadmitted hearsay*.

Mr. Snow, who had never before seen or interviewed Mr. John S. Dayley, or examined him in any manner whatsoever, was asked this question:

Q. Okay. During the periods of time that you examined the file and periods of time you listened to Mr. Dayley recite his history of his lief, did you have opportunity to form an opinion with regard to Mr. Dayley's particular psychological make up?

Tr., pp. 119–20.

He said he had an opinion, and, led on by the Department's counsel, he gave it; in particular, he recited his reliance on the hearsay information which he had read in the court file:

A. Listening to Mr. Dayley's testimony and in reviewing the file, it's my opinion that Mr. Dayley has very serious personality disorder known as the antisocial personality *as defined in the diagnostic and statistical manual three* that I have used for years in my diagnostic work as a psychiatric social worker mental health.

Q. What do you base that opinion on?

A. That opinion is based on the information that I heard from Mr. Dayley *and the information I read in the file* as being consistent with the criteria that is *defined in the diagnostic and statistical manual* that lead to the diagnosis of antisocial personality disorder.

Q. What kinds of things did you see and hear that makes you believe he has or does have an antisocial personality?

A. There are several factors that the manual points out and also my experience verifies in terms of what I have seen and worked with antisocial folks but not many, is the problem of work. One of the characteristic features in antisocial personality is the inability to sustain a work history that is consistent the pattern frequent and many multiple jobs not lasting for any length of time and failure to hold jobs for reason of firings and alcohol use et cetera is one factor that leads me to that diagnosis. Another factor that is borne out in the diagnostic criteria is failure to have as responsible act as a parent in a responsible way in providing for parental responsibilities, financially as well nurturing relationships providing a nurturing relationship, but primarily what I'm hearing here today is the failure to provide a home for children, his children, financially and meet their needs. The other feature is in point, also disorder, is the product and long history of antisocial behavior, the law violations, the frequent housing at an institution and prison or in jail. Just frequent history of repeated violations of laws.

Q. And anything else that you went into that determination?

A. Also *in the manual is spelled out failure to meet one's financial responsibilities*. To pay one's bills as a pattern of problem that seems to be showing. This is also in the criteria.

Q. Okay.

A. Another problem I'm hearing is likewise sustained is that interpersonal level. That there is troublesome history of getting along. And marriages do not sustain or not maintaining relationship and friendships. A problem of just generally holding nurturing and carrying a relationship. I'm not hearing that has happened, and there had been some troublesome relationships in marriage. And those are some basic elements that I hear or heard today.

Q. Mr. Snow, are you aware of any problems through your experience or ed-

ucation and training with regard to parenting from one who has antisocial personality.

A. Yes, I am.

Q. And what is that?

A. Antisocial personalities do not make good parents.

Q. Why is that?

A. The very nature of the mental disorder is such that capacity to bond and relate in an empathic way is not there. That the capacity to sustain and nurture a warm, close relationship is missing. The antisocial personality most frequently comes from a troublesome background in their own upbringing, and fail to somehow learn in their own lives what it takes and has never been put into them that it takes to sustain a loving and emphatic relationship. And this failure to feel for another person's points of view allows them to have reckless living and not pay bills, and to often violate the law, and not feel the restraints of society that we all feel in order to live in society.

Q. *Do I hear you saying then that a person with the problem as you diagnosed Mr. Dayley would have a difficult time giving the love that a child needs to be nurtured properly?*

A. That is what I'm saying. He would have an extremely difficult and I would say impossible time in providing a consistent, loving, close, nurturing relationship to a child which is vital for the child's proper development.

Q. Now, in your training, do you say you have, are you able to form an opinion as to whether or not an antisocial personality person can like change that personality?

A. I have an opinion on that.

Q. And what is that?

A. If the condition is a chronic one, that it never goes away, and that often times an antisocial personality presenting behaviors of law violations, cunning and lying can be greatly diminished and most often greatly diminished with age. As an individual grows older and learns what it takes to get along in society and

to negotiate his needs legally, then the antisocial behavior we would see normally is known to diminish. The other aspect of the personality disorder, however, the interpersonal inability to bond and to be emphatic and to feel for another person's needs doesn't go away. That is chronic and it remains unchanged. There is no known treatment to this date in working with antisocial personality disorder.

Tr., pp. 120–23 (emphasis added).

Mr. MacConnell, on cross-examination, prevailed upon Mr. Snow to admit that he had never before in his life seen Mr. Dayley, nor ever corresponded with him, and that, specifically, his testimony and curbstone diagnosis were "based solely on your observation of the record and your observations in the court-room today." Tr., p. 125.

Mr. MacConnell also obtained from Mr. Snow the Department's definition of a clinician consultant:

Q. Mr. Snow, what is a clinician consultant?

A. A clinician consultant is a job classification or position I have in Health and Welfare at the child welfare unit in Jerome that—I work with case workers and consulting with them on their clients and developing treatment plans for ongoing services.

Q. That is a job classification?

A. It's a job definition in Region Five. The job classification through a state personnel office would be Social Work Specialist Senior.

Tr., p. 124.

Mr. Snow was adamant that no psychiatrist would disagree with him:

A. I would be fully confident that a psychiatrist that would diagnose Mr. Dayley would also come up with an antisocial diagnosis. The DSM 2 would be called psychopathic diagnosis and sociopathic. It's a term they don't use in the new nomenclature. It's called an antisocial, and what do you is rule out other diagnosis such as major psychiatric disorders in the psychotic category, such as schizophrenia and manic depressives.

You also rule out the person's intellectual capacity, and you rule out the neurotic disorders such as depression, and if these features aren't there and you see all these other things that I'm hearing, then you are left with antisocial personality disorder. And I don't pick up the psychotic features and neurotic features. I serve as a designate examinate in examination for the court patients on civil commitments. I do this quite often, and just sitting and listening and hearing, I'm feeling very confident that the antisocial disorder is an appropriate diagnosis.

Tr., pp. 126–27.

Which was all for Mr. Snow, and he was excused.

Mr. MacConnell, probably taken somewhat aback by a surprise Department "expert" from the audience, recalled Mr. Dayley to inquire of him regarding psychiatric examinations. Mr. Dayley stated that he had been examined by three or four such specialists and experts while undergoing evaluation by the State Board of Corrections.

When Mr. MacConnell asked for their conclusions, the Department's counsel precluded this important information by an objection that it would be hearsay, which was sustained, notwithstanding Mr. MacConnell's importunations to its relevance and impossibility of obtaining the witnesses.

Mr. Dayley, on examination, did agree that as to his conduct a few years ago, that what Mr. Snow concluded was "possibly a close diagnosis, BUT, explained that it was not presently viable:

Q. [MR. MacCONNELL]: Do you believe at this time that you're an antisocial personality?

A. No, I'm not.

Q. Why not?

A. Well, Mr. Snow stated that a person with antisocial behavior was seldom ever able to maintain close interpersonal relationships with people for any length of time. I was married to my first wife for seven years, and the only thing that separated us was the fact that I made a criminal error and went to prison. The personal relationship was very strong. In fact, for two years after I went to prison she stayed with me. That basic understanding and what she and I had wasn't dissolved for two years after my incarceration. She still wanted to maintain the relationship. The problem was and reason we separated wasn't because I didn't love her. I didn't understand her, and she didn't understand me or that I didn't take the time to try to understand her problems or her feelings or vice-versa. At that time that the premise he based this diagnosis upon was totally false. My relationship to Anna was a close personal relationship. And lots of problems I had occurred because I tried to be understanding and tried to give her the opportunity to prove herself, and I shouldn't have.

Q. What about your relationship with your brothers, are you close to them?

A. I have a very close interpersonal relationship. It has been life-long.

Q. Do you speak with them frequently?

A. On a monthly basis and sometimes even more often.

Q. Do you hear from them through correspondence?

A. Yes, all the time.

Q. Furthermore, he also based his judgment on facts that I have repeated violations of the law. I don't deny it. I have had repeated violations of the law. I did state earlier that some of the record was incorrect as quoted by the prosecutor. And I am not going to—there is no point in my trying to rebut that. I can't prove facts and figures here today and produce them to contradict any of it. I'm not proud of it. I'm ashamed of it. And I want the opportunity to make the obvious that I have changed or make obvious I have made some definite changes. In the last year I have been the president of the Caldron Club which is a social organization at the institution. It's dedicated to—Well, reform within the prison with regard to inmates' re-

sponsibility for his own actions. We made some pretty good starts, too. I have been the chairperson and one of the committeemen for one of the other clubs there, the Alma Club. I have been associated with and I have been spokesman for the Alcoholics Anonymous group there for almost a year. These are things that definitely wouldn't fit in an antisocial behavior. I'll have to agree with Mr. Snow I probably fit the antisocial behavior pattern here a year or two ago, but there has been a lot of very dramatic things happen in my life in the last two years that has forced me to take a look and realize, hey, you have made some mistakes and you never are going to amount to anything. You never are going to have friends or anything if you don't change your pattern and don't start trying to understand and agree with people. I want my daughter very much. I love her very much. I hurt here because I have been absent from her for so long. I have got a picture that I have carried the last year and a half. It's the only one I have had. And I have begged people to send me pictures. I finally got a picture here last week, and I took that picture and I made a frame for it and sat it right there on my stand where I could see it every morning and every night. There is not a day that goes by I don't think of my daughter. Now, I have blown every opportunity I have had to raise my children in the past, and if I'm given this chance, I know it's the last one I'll get. I'm too old to have any more children. Even by the time Alena is grown and able to take care of herself, I'm going to be in my 60's, and I'm not going to have that much time with her then. Time is so precious anymore. I'm tired of wasting it. I have looked—you know, it's probably the hardest thing for a person to do is look at the psychiatric evaluations and the evaluations that other people put on me and to accept them as reality and accept it as the facts. Hey, these people don't like me. And then look at your actions and say, "Boy, I made some terrible mistakes." And in the past I have been able to ignore it and put it out of my mind and not think about it. I haven't been able to do it for over two years now. When I made this mistake and went to prison for these checks, I lost my chance with Alena then and I realized I made a terrible mistake. And thoughts I have been granted a reprieve by the Department of Health and Welfare because they made out a contract. There is a copy of it right there on the table, and I was to comply with that contract. And I have done so to the very best of my ability. I have worked diligently every day and night in fact to try to maintain contact with my daughter and try to show that I want her and I'm willing to do anything necessary to take care of her and support her and be a good father to her. I want to be her father. I don't want to be just her progenitor. I want to be her father. I don't want to be—I want that more than anything else in this world right now, and I'll do whatever is necessary to obtain that.

Tr., pp. 134–37.

## IV.

This proceeding is called a civil action, rather than a criminal action, but the penalty to the losing defendant is more severe than on conviction of most criminal offenses.

While the majority in a criminal case would readily concede that a person cannot be convicted of a crime with which he has not been charged, here the majority sees no problem with a charge against Mr. Dayley which does not specify the particular section of a statute under which the Department has elected to pursue Mr. Dayley. When Judge Holloway finds that the Department has not made out a case of abandonment—and the judge was absolutely right—the majority shows no concern in considering the charge as neglect, and then upholding a conviction under that unpleaded and oral undeclared charge. Nor does the majority find any problem that even neglect is doubtfully proved because it is

coupled with a "probability" of Mr. Dayley's inability to avoid returning to his ways of over ten to twenty years ago.

Nor does the majority give any regard to the fact that Mr. Dayley was a Department witness—a main witness who was being used instead of genuine Department witnesses so that an unknown Department employee could sit in the audience and conduct a laboratory, clinical evaluation of. Mr. Dayley's social behavior.

Nor does the majority recognize that as a Department witness, Mr. Dayley was not impeached as to his credibility in the slightest, and his testimony cannot be ignored under the well-established *Pierstorff* rule, last cited in *Farber v. State,* 107 Idaho 823, 824, 693 P.2d 469, 470 (Ct.App.1984). Nor does the majority seem aware that the Walquist report was not offered nor admitted in evidence, and that a great injustice is done to Mr. Dayley by giving it consideration in passing judgment on Mr. Dayley, both by this Court, and by Mr. Snow.

Nor does the majority recognize that Mr. Dayley's only supplication is that he be given a monitored opportunity to prove himself before this devastating relief is granted to the Department and that the Department has not, in this proceeding at least, provided any explanation for its disruption of the six months of what was probably Alena's most stable and healthy environment since birth.

### V.

In my view, Judge Holloway's efforts at a fair and legally-based decision in this case far exceed this Court's easy disposition of the appeal. Judge Holloway was obviously aware of the *Pierstorff* rule when he wrote a decision which shows that he was quite favorably impressed with Mr. Dayley as a credible witness:

"THIS MATTER came before the court the 12th day of June, 1985, before the Honorable Roy C. Holloway, Magistrate presiding, pursuant to a petition by the Department of Health & Welfare for termination of the parental rights of the respondent John Stanley Dayley. The petitioner appeared, being represented by Alfred E. Barrus, Deputy Prosecuting Attorney for Cassia County; the respondent appeared being represented by Robert M. MacConnell, Attorney at Law. Whereupon evidence was presented to the court, the court having taken the matter under advisement renders the following Opinion.

"This case involves a child two years old who is currently in the custody of the Department of Health & Welfare and placed in foster care. The child came into the Department's custody pursuant to a stipulation by both the biological father and mother subsequent to the filing of a petition under the Child Protective Act. Subsequent to that stipulation, a petition for renewal of custody was filed and after a hearing, the court renewed the custody in the Department for a period not to exceed one year.

"Thereafter, and prior to the expiration of one year, the Department petitioned this court for termination of the parental rights. The biological mother of the child, Anna Dayley, voluntarily terminated her parental rights, but the biological father, John Stanley Dayley, resists the petition. Having in mind the standard of clear and convincing evidence, the court finds the following facts regarding the parental relationship between Alena and John Stanley Dayley exist as follows:

"The child was born to the respondent, Mr. Dayley, and his common law wife Anna Dayley, July 1, 1983, while they were living in Portland, Oregon. Problems developed between Mr. Dayley and his wife while they still lived in Oregon. After having moved back to Burley, Idaho, with the child, Mr. Dayley continued to have problems with his wife which culminated when she took the child and left. It took Mr. Dayley quite some time to locate his wife and child; when he did, he found the child in very poor health. The evidence shows the child had pneumonia, diarrhea and was suffering from numerous yeast sores on her body.

"Mr. Dayley removed the child from his wife's physical custody, delivered the child to Jay and Evelyn Dayley; Jay Dayley being the respondent's first cousin. At that time a petition was filed under the Child Protective Act and the Department of Health & Welfare became involved. The Department acquired custody of the child pursuant to a stipulation with the parents which provided for custody in the Department for a period of three months. The stipulation further provided that the parents would comply with certain requirements and that at the end of the specified time the child would be returned to the custody of her parents.

"John Stanley Dayley failed to comply with the agreement with the Department and the only provision he complied with was that he maintained regular contact with the child, although he did make some payment toward the child's support. In late February, or early March, 1984, Mr. Dayley was arrested and subsequently imprisoned on a felony conviction. Since having been incarcerated, the respondent has taken what steps he could to maintain contact with the child and although the amounts of support he has provided are minimal in dollar amount, they constitute a major portion of the funds available to him.

"There is no question that the child was abused and/or neglected by the mother after having separated from Mr. Dayley in Burley, Idaho.

"The respondent's background shows several convictions for insufficient funds checks and a conviction for robbery in 1972. He has been incarcerated in the Idaho State penitentiary on several different occasions. The most recent of which stemmed from his March, 1984, arrest. Over the past ten years, the respondent has failed to maintain steady employment and failed to maintain the same residence for any appreciable length of time. With only a few exceptions, the respondent's periods of employment have been less than six months.

"This proceeding is before the court pursuant to Title 16, Chapter 20 of the Idaho Code which provides for the termination of parent-child relationships on both voluntary and involuntary bases. Idaho Code Sec. 16–2005 provides for six circumstances under which termination may be granted.

"The petition in this case fails to allege which of those conditions is relied upon by the Department in seeking termination. Counsel for the Department argued only that the first of those conditions existed, that being abandonment of the child by the respondent. Counsel argued that the respondent, having been incarcerated, in the penitentiary had failed for more than one year to maintain a normal parental relationship with the child and argued that the fact of incarceration alone should be sufficient to establish this abandonment. Counsel cites two cases which purport to support such a legal interpretation. The court has reviewed two annotations of such cases.

"The first, entitled 'Parent's Involuntary Confinement or Failure to Care for Child as Result Thereof, as Permitting Adoption without Parental Consent,' 78 A.L.R.3d 712 (1977), and the subsequent annotation, 'Parent's Involuntary Confinement, or Failure to Care for Child as Result Thereof, as Evidencing Neglect, Unfitness, or the Like in Dependency or Divestiture Proceeding,' 79 A.L.R.3d 417 (1977). The annotations noted the case argued by counsel and it appears clear to the court that the cases do not set a per se rule.

"The first annotation noted at 78 A.L.R.3d 712 states:

While the general rule is that neither incarceration alone, nor inability to support one's children due to such incarceration, constitutes abandonment or desertion under an adoption statute dispensing with the need for parental consent in the event of abandonment or desertion on the parent's part, some authority exists for the contrary propositions both as to incarceration per se and as to incarceration-related nonsupport.

*Id.*, at 719. In reviewing both annotations, it was clear that by far the majority of cases clearly rejected the per se rule and that the majority and better-reasoned cases

held that incarceration alone did not constitute abandonment.

"Even the cases which purported to announce a per se rule are questionable in light of the factual circumstances described. In those cases other evidence of parental misconduct existed which justified the finding of abandonment. In the area of termination or divestiture actions, which were the subject of the 79 A.L.R.3d 417 annotation, the same general rule was announced with exceptions existing where the controlling statutes specifically provided for termination upon imprisonment, loss of civil rights or other disabilities attendant upon incarceration, but these cases were based upon a statutory scheme unlike that which exists in Idaho. In that annotation at 79 A.L.R.3d 417 the compiler noted:

In reaching the aforementioned factual determinations, several courts have enunciated the broad rule of law that abandonment is not established by incarceration or institutionalization alone. Contrarily, where the controlling statute expressly provided for termination of the parent-child relationship on a showing of imprisonment, loss of civil rights due to imprisonment, or some other disability attendant upon incarceration, the factor of imprisonment was often held determinative in adjudging the parent's custodial rights, . . . .

*Id.,* at 427.

"It is clear then that abandonment is not predicated upon the incarceration of the respondent alone and absent other factors which indicate abandonment of the child, the mere fact of incarceration is insufficient to establish abandonment. The evidence in this case clearly indicates that the respondent has done what limited things are in his power to continue to maintain a relationship with the child and that prior to his incarceration he maintained regular personal contact.

"The court concludes that the state has failed to show by clear and convincing evidence that the child has been abandoned. However, although not specifically argued by the state nor specifically alleged in the petition, evidence was presented to the court at the hearing concerning the second condition under which termination is permitted, that being neglect or abuse of the child by the parent. Neglect as used in the statute is defined to mean 'a situation in which the child lacks parental care necessary for his health, morals and well being.' Counsel cited *State v. Cheatwood,* [108 Idaho 218, 697 P.2d 1232] No. 15344, Idaho Ct.App., March 28, 1985, and in discussing parental neglect, the Court of Appeals dismissed the mother's contention that she had not inflicted any harm upon the child, noted, 'It is sufficient that the child "lacks parental care necessary for his health, morals and well-being." The termination statutes of this state exist not merely to alleviate harm but to prevent it.' It is clear to the court that a parent's failure to provide the necessary direction and nurturing necessary for normal development of a child constitutes neglect under the statute and that no particular harm must be shown to exist before a finding of neglect can be predicated.

"Further, in the Idaho case *Thompson v. Thompson,* [714 P.2d 62] No. 15171 Idaho Ct.App., March 15, 1985, the Court there again in affirming the termination of parental rights noted:

Further, the statute defines neglect as a situation in which the child lacks *parental* care necessary for his health, morals and well-being (emphasis supplied). I.C. Sec. 16–2005(b). We take this statute to mean that a parent is not relieved of his or her responsibility to provide appropriate parental care by relinquishing custody of a child to a relative or friend.

It is thus clear that the responsibility of a parent is not relieved when the parent delivers the child to some other relative or agency as the case may be for care. In the case at bar it is clear to the court and the evidence is undisputed that after having taken the child to his cousin, the respondent failed to provide parental care necessary for the child's health, morals and well-being. Although the respondent made periodic visits to the child and provided ap-

proximately $150 of support from the end of November, 1983, until he was incarcerated in March, 1984, the respondent did nothing else and was content to allow other people to discharge his parental responsibilities.

"The court therefore concludes that given the definition of neglect in the statute, there is clear and convincing evidence to establish that the respondent did neglect the child and therefore, grounds exist for the termination of the parent-child relationship. This, however, does not end the court's inquiry. The statute provides, 'the court *may* grant an order terminating the relationship where it finds one or more of the following conditions exist . . .' (emphasis added).

"Although the court may have the authority to terminate the relationship upon this finding of neglect, it is the opinion of the court that this *finding of neglect is not in and of itself sufficient to justify the termination. As a practical matter* in child protective proceedings, one or more of the conditions under which termination may be granted always exist in order to bring the child within the purview of the Child Protective Act. Termination is not an appropriate result of all child protective proceedings. In fact, the court, upon findings of neglect or abuse, will in many instances not even remove the child from the parents' home, but will simply order protective supervision by the Department of Health & Welfare. It is thus clear that something more must exist in order to justify the termination of the parent-child relationship.

"In this respect the court notes the statement of purpose by the Idaho legislature contained in I.C. Sec. 16–2001. Among other purposes, the legislature notes, as follows:

Implicit in this act is the philosophy that wherever possible family life should be strengthened and preserved and that the issue of severing the parent and child relationship is of such vital importance as to require a judicial determination in place of attempts at severance by contractual agreements, express or implied, for the surrender and relinquishment of children.

It seems clear to this court that the statement of purpose is indicative of a legislative intent that termination be granted only where it is impossible to preserve the family. This position finds support in the *Thompson* case wherein the court observed:

Here, the magistrate considered alternatives to termination, such as perpetuation of the guardianship or foster care. He concluded, however, that those alternatives would not be beneficial to the child's best interests, as 'there is no reasonable circumstance under which the child's welfare would be served by the continuation of the parental rights in the parent.'

*Thompson v. Thompson*, [714 P.2d 62] No. 15171, Idaho Ct.App., March 15, 1985.

"The final question for the court then is: Given the evidence in this case, is it possible to reunite this family? The state has introduced evidence that the respondent in the past ten to twelve years has continually been involved in criminal activity; he has failed to maintain steady employment for any significant period of time; he has failed to maintain a stable and continuous residence; he abdicated his role as a parent with this child and failed to comply with his agreements with the Department which would have returned the child to his custody.

"Additionally, there was evidence presented by the state indicating that the defendant may have an anti-social personality, however, this evidence was based upon a review of the case file and the state's witness' observation of the defendant while he testified in this case. Although the court does not question the qualifications of the state's witness, the diagnosis carries little convincing force.

"Notwithstanding the inconclusiveness of the psychological diagnosis of the respondent, the court finds the probability of the respondent reversing a decade of irresponsible behavior to be extremely remote.

Unfortunately, for the court, this is not a case where the evidence is overwhelming and it is with no light regard for the welfare of the child, nor the rights and feelings of the respondent that the court concludes that the evidence justifies a termination of the respondent's parental rights."

From the foregoing, it is apparent that the court reluctantly granted the relief requested. In my view, it should not have done so, and probably forgot the statutory requirement that the Walquist report could not be considered where it was not placed in evidence.

I cannot agree with the majority that there is no error below where the trial court could not see that the Department of Health & Welfare had established a case of abandonment, under which section it elected to come; then, turning to another entirely different section (neglect), and, still finding no case made by the state, decided against Mr. Dayley upon a remote "*probability* of the respondent reversing a decade of irresponsible behavior." What law is this?

Moreover, implicit in the Court's conclusion is its belief that termination should be granted unless it was possible to preserve a family unit: "The final question for the Court then is: Given the evidence in this case, *is it possible to reunite this family?*"

Of course, the "family" could not be reunited at the time the Department brought this proceeding, not if a family unit has to have a wife/mother. There was none left but Mr. Dayley and Alena.

The Department filed the action knowingly and willfully when Mr. Dayley was serving time, and hence not well-positioned to do anything. True, Mr. Dayley had an unsatisfactory record, but equally true most of those "ten to twelve years" were far in the distant past in relation to his two-year-old daughter.

At oral argument, we were informed, without contradiction, that he had led an exemplary life after his release from prison, and had been continually well-employed. We also observed his composure and restraint at oral argument, which quality also shows through during his lengthy interrogation of the Department's counsel—certainly no friend of Mr. Dayley, and at times seemingly attempting to provoke Mr. Dayley.

All that I can make of this case is that the trial court erred in leaning against a reunion of Mr. Dayley with his daughter, and this Court simply believes that no man, no father, should have a second chance, even where he has proved himself so entitled.

## VI.

The Court's decision in this case has singular application to only two people—John Dayley and Alena Dayley. In the proceedings below, and then again in this Court, it is only the voice of John Dayley who has been heard. It was the intent of the legislature, however, that Alena Dayley should also be heard from. I.C. § 16-2007. From what can be made of the record, Judge Holloway did not take it upon himself to comply with that statute; it would be but idle speculation to wonder why. However, one must wonder why, where the contest looming before him for an awesome decision was the might of the sovereign State of Idaho, petitioner versus John Dayley, *sole* defendant. The true caption of the case, however, was: "In re the Interest of Alena Dayley." Alena Dayley had the usual two parents, but the mother had not taken care of her and was quick to sign away her parental rights. Alena Daley, a two-year-old baby girl, still had a father who loved her and who was waiting for the day they would be reunited. Unable to speak for herself, and too young to know and comprehend, she was in the most dire need of someone to look out for her interests, someone independent of her father, someone who could evaluate the situation carefully and, if necessary, stand in the way of the relentless state juggernaut. Relentless, I say—and, on this record, could say ruthless as well—in view of the state's having taken her out of the Dayley family where she spent the best six months

of her short life. Clearly, that relationship should not have been interrupted, and equally clear, the parents of that family stood in *loco parentis* to Alena and were also entitled to be heard from, assuming that I correctly read I.C. § 16–2007. They should have been appointed guardians and/or guardians *ad litem* for Alena. If for any reason they did not want to be so positioned, or should the court for good reason (on objection of the Department) see fit to not appoint them, the court should have appointed some neutral person to represent the interests of Alena. What an irony to caption the case "In the Interest of Alena Dayley" and allow that interest to go unrepresented. Not only does the statute so provide, but even without a statute, appointment of a guardian to represent the interests of a child is mandated. That guardian should, if not an attorney, have representation by an attorney.

Only in that way can it be said that the child has been represented and the child's "best interests" advanced and protected.

My recollection is that, in all of these cases which we see, none involving a small child have involved a proceeding where a guardian or an attorney (or both) has not been appointed to represent the child. Briefly, I mention only one of those which quickly comes to mind. In the recent case of *Rhodes v. State Department of Health & Welfare*, 107 Idaho 1120, 695 P.2d 1259 (1985), a guardian *ad litem* and an attorney represented the interests of a four-year-old in a termination proceeding.

Until today, this Court has not been called upon to consider the factors which control the exercise of a trial court's discretion in determining whether to appoint a representative for a child in a custody or a termination proceeding. However, other jurisdictions have addressed this area. The Alaska court has isolated two important factors: the age of the child, and the nature of the claim being advanced. *Lacy v. Lacy*, 553 P.2d 928, 930 (Alaska 1976); *accord. Veazey v. Veazey*, 560 P.2d 382, 385 (Alaska 1977).

Where the child is too young to understand the nature of the proceedings, representation is essential in order that the needs and interests of the child can be adequately protected. *In re P.N.* 533 P.2d 13, 18 (Alaska, 1975). The claim in this case is a termination of parental rights sought by the State. There is little doubt that this is the ultimate weapon in Health and Welfare's arsenal. It represents the total and irrevocable severance of the bond between parent and child. As the United States Supreme Court has recently emphasized, "Few forms of state action are both so severe and so irreversible." *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982).

The Alaska Court's factors make eminent good sense. Applying them to the facts of this case, one can hardly but conclude that it was an abuse of discretion not to appoint a representative for a two-year-old in a termination proceeding.

Some states, such as New Mexico, have a statute couched in mandatory terms: "The court shall appoint a guardian ad litem for the child in all contested proceedings for termination." NMS § 40–7–4(I), *Matter of Adoption of Doe*, 101 N.M. 30, 677 P.2d 643 (App.1984). The statutes of other states like Oklahoma, accord the trial court some discretion. However, the Oklahoma court has determined for policy reasons that independent counsel for the child in termination cases is required. The rationale of the well-reasoned case of *Matter of T.M.H.*, 613 P.2d 468 (Okla., 1980) is particularly applicable here:

"The policy favoring independent counsel for a minor is in conformity with the Uniform Juvenile Court Act adopted by the American Bar Association in 1968, which provides in Rule 26(a) for separate counsel in juvenile proceedings if the interest of two or more parties conflict. In a termination proceeding, if a child is not represented by independent counsel, each attorney presents his arguments from the viewpoint of his client, with the child caught in the middle. Beneath each side's argument in terms of the best interest of the child, lies the desire to pre-

vail for a client, who is not the child. When the court appoints an attorney for the child, testimony is presented and cross-examination done by an advocate who is only interested in the welfare of the child.

The matter of independent representation by counsel, so that a child may have his own attorney when his welfare is at stake, is the most significant and practical reform that can be made in the area of children and the law. The rights and sometimes the interests of children are frequently jeopardized in court proceedings because the best interests of a child are determined without resort to an independent advocate for the child. Courts may fail to perceive children will be affected by the outcome of the litigation, or that potential conflicts between the interests of the children and the interests of other parties require that the child have separate counsel. *Too often the judge assumes the child's interests are adequately protected by DHS.* * *This position is undermined when, as here, DHS is challenged and as such it becomes an interested party, the source of the inquiry.*

We are convinced that in all termination proceedings there are potential conflicts between the interests of the children and those of both the state and the parents as contemplated by §§ 1109 and 24 which are general statutes not necessarily covering only termination. Thus we hold under the above quoted statutes, independent counsel must be appointed to represent the children if termination of parental rights is sought. *Id.* at 470–471 (emphasis added) (footnotes omitted). (* DHS is the Oklahoma equivalent of our Health and Welfare).

It is true as the majority states, that our statute is couched in terms of "may" rather than "shall." No one should have any trouble with that. It is easy to conceive of a 17–year-old, or even a 12– or 14–year-old, who might want to be taken from his parents and the parents could care less. But a two-year-old?

This Court, in its haste to affirm the decision below, is far too careless with the child's rights, and sets a precedent which I believe bodes nothing but ill for the future, and brings little credit to the Court.