IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 37988

| | | |
|---|---|---|
| IN THE INTEREST OF JOHN DOE A CHILD UNDER EIGHTEEN YEARS OF AGE. | ) ) ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) | 2011 Unpublished Opinion No. 375 |
| | ) | Filed: March 2, 2011 |
| Petitioner-Respondent, | ) ) | |
| | ) | Stephen W. Kenyon, Clerk |
| v. | ) ) | |
| | ) | THIS IS AN UNPUBLISHED |
| JANE (2010-21) DOE, | ) ) | OPINION AND SHALL NOT BE CITED AS AUTHORITY |
| Respondent-Appellant. | ) ) ) | |

Appeal from the Magistrate Division of the District Court of the Second Judicial District, State of Idaho, Clearwater County. Hon. Randall W. Robinson, Magistrate.

Judgment terminating parental rights, <u>affirmed</u>.

Thomas J. Clark, Lewiston, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Marcy J. Spilker, Deputy Attorney General, Boise, for respondent.

_____

LANSING, Judge

Jane (2010-21) Doe appeals from the judgment of the magistrate court terminating her parental rights with respect to her son.

## I.

## BACKGROUND

Doe and her son, W.P., first came to the attention of Child Protective Services (CPS) in December of 2007, when W.P. was about three weeks old. W.P.'s doctor alerted CPS that W.P. experienced a failure to thrive, which was later attributed to a urinary tract infection. Doe was provided numerous services to assist her in her daily activities and with parenting and remained

under CPS supervision for sixteen months. CPS then ceased active supervision but still provided Doe with numerous services.

About seven months later, on November 9, 2009, CPS received a call from W.P.'s daycare provider reporting possible physical abuse. Doe had left W.P. at daycare that morning, around 10 a.m., with such a heavily soiled and saturated diaper that it appeared to the daycare worker that W.P had worn it all night. When the daycare provider began to change it, she noticed yellow, black, and blue bruising all over W.P.'s bottom. CPS contacted the Clearwater County Sheriff's office, which sent Detective Barlow to the daycare to investigate. Detective Barlow determined that W.P. was in imminent danger and took him into custody.

W.P. was taken to the hospital and examined by Dr. Peterson, a family practice physician. Dr. Peterson noticed two sets of bruises. One set was in a symmetrical position around the abdomen and had turned yellow, indicating older bruises. Dr. Peterson later testified that these bruises were consistent with a person holding and squeezing a child very tight. Dr. Peterson said he had seen a set of bruises like these previously in a "shaken baby" case. The other bruises were on W.P.'s bottom. These were swollen and darker, indicating that they were only a couple of hours to a day old. Dr. Peterson determined that these bruises were non-accidental because they were produced by multiple impacts. This conclusion was supported by the testimony of W.P.'s family practice physician, Dr. Bunt.

Detective Barlow later met Doe at the daycare when she came to pick up W.P. and accompanied Doe to her home to question her about the injuries. Doe stated that she had not been aware of any bruises on W.P.'s bottom and that it must have been the result of him falling on a toy. Doe later stated the bruises on W.P.'s abdomen may have been caused when he tried to crawl over the bars of his playpen.

Subsequently, the magistrate court ordered W.P. into the custody of the Idaho Department of Health and Welfare (Department). Based on the "aggravated circumstance" of Doe having had her parental rights to another child terminated in another state five years earlier, the magistrate court determined, pursuant to Idaho Code § 16-1619(6)(d), that the Department need not attempt reunification of Doe and W.P.[1] The Department therefore moved for

---

[1] Doe does not challenge this determination or the Department's lack of reunification efforts before it moved for termination.

termination of Doe's parental rights. Following a trial, the magistrate court terminated Doe's rights based on findings that W.P. had been abused and that termination was in his best interests.

Doe appeals, arguing that the court's finding that W.P. had been abused and that Doe was the responsible party are not supported by the record. Doe also argues that the magistrate court erred in determining that termination was in the best interests of W.P.

## II.

## ANALYSIS

An order terminating the relationship between a parent and a child may be entered only if the trial court finds one of the statutory grounds for termination set forth in I.C. § 16-2005(1)(a)-(e) and finds that termination is in the best interests of the child. Abuse of the child is a statutory ground for termination. I.C. § 16-2005(1)(b). A parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest, protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007); *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). Consequently, a judicial decision to terminate a parent-child relationship must be supported by clear and convincing evidence. *In re Doe*, 143 Idaho 343, 345, 144 P.3d 597, 599 (2006); *Doe*, 137 Idaho at 760, 53 P.3d at 343. On review, this Court will uphold the trial court's findings if they were based on substantial and competent evidence. *Doe*, 137 Idaho at 760, 53 P.3d at 343. Substantial and competent evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," even if the evidence is conflicting. *Doe*, 143 Idaho at 345-46, 144 P.3d at 599-600; *In re Doe*, 142 Idaho 594, 597, 130 P.3d 1132, 1135 (2006). Because the trial court is better positioned than an appellate court to observe a witness's demeanor, assess credibility, detect prejudice or motive, and make character judgments, we review the facts, and reasonable inferences to be drawn from those facts, in the light most favorable to the trial court's decision. *Doe v. Doe*, 148 Idaho 243, 246, 220 P.3d 1062, 1065 (2009); *State, Dep't of Health & Welfare v. Doe*, 145 Idaho 662, 664, 182 P.3d 1196, 1198 (2008); *Doe*, 142 Idaho at 597, 130 P.3d at 1135; *In re Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991).

### A.     Abuse

We consider first Doe's argument that W.P.'s bruises were not severe enough for a finding of abuse and that the clear and convincing evidence of extensive, chronic, long-term

3

mistreatment or great bodily harm was required to support such a finding. This argument is refuted by the statutory definition of physical abuse of a child as:

> Conduct or omission resulting in skin bruising, bleeding, malnutrition, burns, fracture of any bone, subdural hematoma, soft tissue swelling, failure to thrive or death, and such condition or death is not justifiably explained, or where the history given concerning such condition or death is at variance with the degree or type of such condition or death, or the circumstances indicate that such condition or death may not be the product of an accidental occurrence[.]

I.C. §§ 16-1602(1)(a); 16-2002(4). This definition does not require proof of extensive, chronic, long-term mistreatment, or great bodily harm. In this case, to find abuse the magistrate court needed only to have clear and convincing evidence of Doe's conduct or omission resulting in bruising to W.P. that was not justifiably explained or may not have been the product of an accidental occurrence.

At the termination proceedings, two doctors testified that W.P.'s bruises were non-accidental. Dr. Peterson, who examined W.P. when the bruises were first reported, stated that the bruises on W.P.'s bottom appeared to be from multiple impacts, which was consistent with non-accidental injuries. After Doe challenged Dr. Peterson's conclusion, Dr. Peterson stated:

> . . . I believe that's well documented in the medical literature that that's the case. There is not a single trauma that could have inflicted this pattern of bruising. If a child falls and gets one little bruise or does something and gets one little bruise they will not do the same thing again. They won't go falling a whole bunch of times unless there's a cause. One--each of these was a, in my best medical opinion, a separate impact, and the most common cause of multiple impacts in this area is that they are inflicted by another person.

Doe then asked Dr. Peterson whether W.P. could have had multiple falls. Dr. Peterson answered:

> Unlikely, unlikely. The reason I say that is that, you know, we see children fall all the time. We don't see that. They don't weigh that much by taking a little sit on their--falling and sitting on their bottom they don't make these kind of bruises. If he--if he fell off a table onto something that had a point or projection then, yeah, he could get one of those bruises. But I wouldn't expect him to do that repetitively.

Dr. Peterson then indicated that the various bruises on W.P.'s bottom were created about the same time. Dr. Peterson also testified that he had seen bruises similar to the older ones on W.P.'s abdomen in a shaken baby case, where the baby had been grabbed, squeezed, and shaken.

4

Dr. Bunt testified that he had examined children for possible child abuse on many occasions throughout his practice history and that he had completed a two-week special training in which he worked with physicians who treated abuse. Dr. Bunt delivered W.P. and had been his primary care physician since birth. After looking at photographs of the bruises on W.P.'s abdomen and bottom, Dr. Bunt testified that he would consider the bruises non-accidental because they were in areas that are not associated with accidental trauma and specifically agreed with Dr. Peterson that the bruises on W.P.'s bottom were non-accidental because they were caused by multiple impacts.

Additionally, Doe's own lay witnesses, social service providers who testified that they were on the alert for signs of possible abuse, testified that if they had seen on W.P. the bruises depicted in the photographs they would have reported them as possible abuse because the bruises are severe and cause concern.

Doe argues that the evidence that she abused W.P. is not clear and convincing. She posits that the bruises could have been caused by Doe's live-in boyfriend or W.P.'s daycare. We are not persuaded. First, the statutory definition of abuse encompasses a parent's failure to protect children from abuse. I.C. § 16-1602(1)(a) (abuse is the result of "conduct or *omission*" on the part of the parent) (emphasis added). *See also In re Brown*, 112 Idaho 901, 903, 736 P.2d 1355, 1357 (Ct. App. 1987) (discussing both the mother's specific acts against her children as well as her failure to prevent others from harming her children, in the context of holding that a mother abused her children). If Doe's live-in boyfriend did abuse W.P., that would not absolve Doe, for her failure to protect W.P. would also constitute abuse. The evidence showed that Doe, at the very least, must have been aware of the older abdomen bruising and failed to prevent the abuse that caused it or prevent the subsequent abuse which resulted in bruising to W.P.'s bottom. Further, it is clear from the testimony of the daycare provider and the responding CPS worker that the daycare provider contacted CPS within ten minutes of Doe dropping W.P. off at 10 a.m. The CPS worker, Detective Barlow, and Dr. Peterson all agreed that the color and nature of the bruises as depicted in the photographs were what they witnessed at the time they first examined W.P. For the CPS worker, this was between 11:15 and 11:30 a.m. Dr. Peterson testified that the coloring of the bruises indicated that the bruises could not have been less than two hours old. Therefore, it is unlikely that the bruises could have been made by the daycare provider. Although there was some conflicting testimony concerning when W.P. was left at daycare, when

Detective Barlow arrived on the scene, and the age of the bruises, the trial court is better positioned to assess the credibility of the witnesses and the inferences to be derived from their testimony. *Doe*, 148 Idaho at 246, 220 P.3d at 1065; *Doe*, 145 Idaho at 664, 182 P.3d at 1198. There was substantial evidence supporting the magistrate court's conclusions.

Doe's suggestions of accidental causes of the bruises are also unpersuasive. Both experts testified that the bruises on W.P.'s bottom were from multiple impacts and therefore unlikely to be accidental. As the magistrate court stated, aside from any expert opinion, it strains logic to claim that a child would continuously fall with the force necessary to cause those bruises in the same area over and over again in fairly rapid succession. In addition, Dr. Peterson opined that the symmetrical nature of the abdomen bruises was consistent with holding and squeezing a baby hard.

Doe next argues that it was improper for the magistrate to rely on Dr. Peterson's opinion as to the nature and cause of W.P.'s bruises because Dr. Peterson's credentials did not demonstrate that he was qualified to render such an opinion. We conclude, however, that the magistrate did not abuse his discretion in considering Dr. Peterson's testimony. Dr. Peterson had extensive experience in family practice medicine and served as an emergency room physician on a weekly basis. He explained in detail the basis for his conclusions as to the age and depth of W.P.'s bruises and the appearance of multiple bruises caused from separate impacts. Moreover, Dr. Peterson's opinions in this regard were confirmed by Dr. Bunt, whose credentials are not challenged by Doe.

Finally, Doe asserts that any evidence of abuse is refuted by the child's own behavior. Witnesses agreed that W.P. was generally a happy, social, and gregarious child and even presented this same behavior on the morning when the bruises were discovered and he was examined by Dr. Peterson. No witness testified that the child was fearful of adults, engaged in aggressive behavior, or evidenced other maladaptive behavior that would tend to indicate a history of abuse. Doe also points out testimony that there was a strong bond between Doe and W.P. and that the child was quite attached to Doe. While this evidence may indicate that W.P. had not been subjected to severe and long-term abuse, it does not erase the evidence of specific, recent abuse evidenced by the serious, multiple bruises on the child. As noted above, a long-term pattern of abuse is not required to meet the statutory standards for a finding of physical abuse that will justify termination of parental rights.

6

In light of the substantial and competent evidence of extensive bruising on W.P., and the expert testimony showing that the bruising was non-accidental, we hold that the magistrate court had ample evidence before it to support its determination that physical abuse had been proven by clear and convincing evidence.

**B.      Best Interest of the Child**

Doe also challenges the magistrate court's finding that termination of Doe's parental rights was in the best interest of W.P.  She argues that because her earlier supervision by CPS had been terminated seven months before the investigation into W.P.'s bruises, Doe had obviously made progress with CPS's services, which counters the finding that successful reunification would be unlikely.  Doe also contends that she had served well as a parent to W.P. up until the time of the instant abuse by providing a stable, secure, and healthy home environment and continuing to engage in social services to become a better parent.  This is evidenced, Doe asserts, by W.P.'s happy and social character.  Doe also alleges that the magistrate court failed to consider the strong bond between Doe and W.P.

One factor for a court's consideration in determining whether termination is in the best interests of the child is the likelihood of successful reunification.  *See Dayley v. State, Dep't of Health & Welfare*, 112 Idaho 522, 526, 733 P.2d 743, 747 (1987).  Another appropriate factor for the court's consideration is evidence of improvement in the well-being of the child while living apart from the parent.  *Doe v. Dep't of Health & Welfare, Human Serv. Div.*, 141 Idaho 511, 517, 112 P.3d 799, 805 (2005).

We conclude that there is substantial and competent evidence to support the magistrate court's finding that termination was in W.P.'s best interests.  That Doe was unable to avoid or prevent abuse of W.P. despite the plethora of support services provided by the Department is compelling evidence that termination is in the best interests of W.P.  Evidence at the termination hearing showed that in spite of multiple services provided to Doe, she provided poor care for W.P.  The Department provided Doe with a number of services for almost two years to help her learn to care properly for herself and W.P.  These services included:  a psychological evaluation and individual counseling; infant-toddler services, including daycare and parent resource and education classes; home visits; and developmentally-disabled services for Doe.  A Department representative testified that there were no services that Doe could be given that had not already been provided at the time that W.P. was abused.  Notwithstanding all of this assistance, the

daycare provider testified that on many mornings W.P. was left at daycare at around 9 or 10 a.m. in a soiled diaper that was soaking wet, appearing as though the diaper had not been changed since the evening before. The evidence also showed that W.P. had made rapid developmental progress while in foster care. Both W.P.'s foster mother and two Department representatives testified that W.P. had a severe speech disability when he was placed in foster care and had made significant progress since that time. Before coming into foster care, W.P. knew fewer than fifteen words and rarely spoke, but at the time of the termination trial he knew significantly more words and was beginning to speak in sentences. W.P. was in the fifth percentile for expressive speech before removal, but in the twenty-fifth percentile one month before the first day of trial. Finally, this was not the first episode of child abuse by Doe; her parental rights to another child had previously been terminated in another state.

Although there may be conflicting evidence on some factors the court took into consideration, this Court does not reweigh the evidence, credibility, and factual inferences, for those functions are within the province of the magistrate court. *Dep't of Health & Welfare v. Doe*, 149 Idaho 207, 210, 233 P.3d 138, 141 (2010); *Doe*, 145 Idaho at 664, 182 P.3d at 1198. The magistrate's decision that termination of Doe's parental rights is in the best interests of W.P. is supported by substantial and competent evidence.

## III.

## CONCLUSION

Doe has shown no error in the magistrate court's decision. Therefore, the magistrate court's judgment terminating Doe's parental rights is affirmed.

Judge GUTIERREZ and Judge MELANSON **CONCUR.**